(January 17, 2013)

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TERENCE McCRAY, Appellant. [958 NYS2d 511]—

Spain, J. Appeal from a judgment of the County Court of Albany County (Breslin, J.), rendered September 1, 2010, upon a verdict convicting defendant of the crime of rape in the first degree.

This case, which began with a consensual relationship and ended in defendant's indictment on a single count of rape in the first degree (*see* Penal Law § 130.35 [1]), presents a classic he-said she-said credibility determination. After a jury trial, defendant was convicted and sentenced as a second felony offender to a prison term of 22 years and five years of postrelease supervision. Defendant appeals and we now affirm.

We turn first to defendant's argument that the verdict was against the weight of the credible evidence, necessitating a full review of the testimony adduced at trial. Many details are undisputed. Defendant, then 40 years old, first met the victim—an 18-year-old woman with an extensive history of psychiatric problems—at a bus stop in the City of Albany in April 2009. They talked extensively about various topics, including sex, while walking together until they eventually visited a recreational vehicle that belonged to a friend of defendant. The victim testified that, while inside the vehicle, defendant gave

the victim a back massage, but nothing else happened of an intimate nature. Defendant's version of these events differed only in that he testified that, following the massage, the victim engaged in oral sex with him. Upon parting that night, the victim gave defendant her telephone number and they spoke on the telephone a few times in the weeks ahead. On May 26, 2009, defendant called the victim and invited her out for the evening. The victim's mother drove her to defendant's residence, where the victim met members of defendant's family, and she then dropped the pair off on Lark Street. They walked around for a while and stopped at the home of defendant's friend, Marvin Calhoun, where they visited with Calhoun and his family. The victim admits that she exchanged sexual innuendos with defendant during this visit. After a few hours, the couple left, ending up at the apartment of another one of defendant's friends, Kevin Johnson, where they engaged in consensual kissing and fondling.

It is at this point that the testimony of defendant and the victim sharply diverges. The victim testified that after about 15 minutes, defendant wanted to have intercourse but she refused, telling him it was too soon in their relationship. When defendant continued to insist, she became angry with him and left the apartment. Defendant caught up with her on a street outside the apartment and apologized to her. She stated that they continued to argue while they walked, but that she tired of walking so they sat down. The victim stated that, while seated, they witnessed police officers draw their weapons on a young female with a baseball bat. She explained that this incident made both her and defendant laugh, and she no longer felt angry with him.

Defendant testified that the victim had unsuccessfully asked Calhoun if they could use a bedroom to have sex while visiting Calhoun's family and, once at Johnson's apartment, she initiated sex and it was he who refused to have intercourse there because he thought it was not appropriate to have sex on the couch with his friend in the next room. He testified that they left the apartment together in search of another place to have sex, and that the victim was willing even to have sex outside in the bushes. Defendant further stated that the victim was not angry with him when they left Johnson's apartment and that they never witnessed the police encounter with the female with the baseball bat.

By both accounts, the couple eventually ended up at an abandoned house located at 595 Clinton Avenue in Albany, where the victim followed defendant through the backyard into

the house. At this point, the accounts of the victim and defendant again diverge. The victim testified that defendant backed her up against a wall and started to forcibly kiss and grind against her. She testified that she pushed him away and told him to stop, but that he continued, telling her, "You are going to give it to me or I'm going to take it." The victim stated that they struggled; she punched defendant in the face, near his jaw or chin, and defendant hit her in the face several times and choked her. While he was choking her from behind, the victim testified, she was able to bite his forearm. After an extended struggle, during which the victim tried to make noise to draw attention and begged for her life, she gave up and submitted to sexual intercourse with defendant. The victim stated that, when it was over, defendant did not prevent her from leaving, but told her, "Don't go out there looking like that." The victim stated that she wiped the tears and blood off of her face onto her shirt, then went out the same way they had entered. She further testified that she got caught on a fence while trying to leave, and ripped her shirt. She came upon a pay telephone and called 911. Police officers arrived and she was brought to the hospital for examination. The victim's torn shirt and photographs of her bruised face were admitted in evidence at trial.

By contrast, defendant testified that the couple had consensual intercourse once inside the abandoned building. He explained that after they were through and he asked the victim if she wanted to go home, she suddenly demanded money from him and, when he refused, grabbed his pants and began to leave. Defendant stated that he then tackled the victim to prevent her from leaving and her face struck the floor as they fell. They then struggled as he attempted to pry his money—which the victim had by then extracted from the pocket of his pants— from her hand and, during the struggle, she bit his arm. According to defendant, he eventually managed to squeeze the victim's hand open and retrieve his cash, at which point the victim got up and left the building.

Defendant then went to the home of his friend, James Close, where, according to Close, he pounded on the door, yelling for admittance. Close testified that defendant looked like he was being chased by someone and implied that he wanted to come inside because there was a female outside who was exposing herself to defendant. Defendant testified that he went to Close's house because he wanted to tell him about his encounter with the victim but, suddenly realizing that the abandoned house he had been trespassing in might belong to Close, changed his mind and left. He explained that he might have referred to the

victim as "the girl [who] lifted her shirt up on Central Avenue that time" because he had told Close about his first meeting with the victim and that she had exposed herself on the street that night to some passers-by.

Based on this evidence, it would not have been unreasonable for the jury to believe defendant's testimony that the sexual encounter was consensual.[1] Thus, to determine if the verdict was against the weight of the evidence, we " 'must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' " (*People v Terry*, 85 AD3d 1485, 1486 [2011], *lv denied* 17 NY3d 862 [2011], quoting *People v Romero*, 7 NY3d 633, 643 [2006]), while giving due deference to the credibility determinations of the jury (*see People v Wright*, 81 AD3d 1161, 1163 [2011], *lv denied* 17 NY3d 803 [2011]). Defendant, both in counsel's brief and in his pro se submission, relies on inconsistencies in the victim's testimony, her mental health history and his interpretation of the physical evidence and testimony adduced at trial to argue that the verdict is against the weight of the credible evidence. Examining all his arguments and the proof adduced at trial, we find no legal basis for substituting a different conclusion from that reached by the jury.

Defendant focuses on the fact that a hospital record states that the victim reported to medical personnel that the attack lasted three minutes, while she testified that they struggled for 30 to 45 minutes. A review of that record, however, suggests that the time reported may refer to the duration of the rape, as opposed to the entire struggle. Further, defendant emphasizes the fact that, according to a hospital record, the victim first reported that there was some consensual kissing at the abandoned house, but thereafter testified that the kissing was also against her will. We do not find this inconsistency to be evidence that the victim's testimony is fundamentally unreliable; she was cross-examined on this at trial, thus putting the credibility determination squarely in front of the jury. Faced with inconsistencies, "the jury 'was entitled to credit some of her testimony while discounting other aspects' " (*People v Hoppe*,

---

1. A defendant is guilty of the crime of rape in the first degree "when he or she engages in sexual intercourse with another person: [b]y forcible compulsion" (Penal Law § 130.35 [1]). As no dispute exists that defendant and the victim engaged in sexual intercourse, the issue here devolves to whether such intercourse was consensual or by forcible compulsion, which may be by "use of physical force" or "a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person" (Penal Law § 130.00 [8]).

96 AD3d 1157, 1159 [2012], *lv denied* 19 NY3d 1026 [2012], quoting *People v Kuykendall*, 43 AD3d 493, 495 [2007], *lv denied* 9 NY3d 1007 [2007]; *see People v Alteri*, 49 AD3d 918, 920 [2008]). Likewise, defendant's assertion on appeal—that the victim's testimony that they witnessed police officers draw their weapons on a female carrying a baseball bat was incredible—is a decision appropriately left to the trier of fact.

Defendant also argues that the victim's credibility is undermined by her mental illnesses. Evidence was presented at trial that established that the victim had a long history of mental illness; she had been diagnosed with epilepsy, posttraumatic stress disorder, Tourette's disorder and bipolar disorder and, as a result of these conditions, she had been hospitalized more than 10 times in her 18 years. It is well settled that an individual suffering from mental illness may be competent to provide evidentiary testimony at trial (*see People v Gelikkaya*, 84 NY2d 456, 460 [1994]; *People v Rensing*, 14 NY2d 210, 213-214 [1964]). No proof was presented that the victim was unable to appreciate the nature of her oath (*see People v Gelikkaya*, 84 NY2d at 460), and the jury was aware of the victim's diagnoses and was free to determine that she was, nevertheless, more credible than defendant (*see People v Plaisted*, 2 AD3d 906, 909 [2003], *lv denied* 2 NY3d 744 [2004]).

Nor do we find that the victim's testimony was necessarily contradicted by the physical evidence. The victim's injuries, which consisted of a bruise on her face, a cut inside her cheek and a scratch near her lip, coupled with the teeth marks on defendant's forearm, were not so insubstantial as to render the victim's description of the struggle implausible. The victim's testimony was not incredible as a matter of law; rather, the conflicting testimony "presented 'a classic credibility issue' for the jury to resolve" (*People v Mitchell*, 57 AD3d 1308, 1309 [2008], quoting *People v Allen*, 13 AD3d 892, 894 [2004], *lv denied* 4 NY3d 883 [2005]; *see People v Blackman*, 90 AD3d 1304, 1308 [2011], *lv denied* 19 NY3d 971 [2012]).[2]

We turn next to defendant's contention that County Court erred in refusing to turn over all of the victim's mental health

___

2. In his pro se brief, defendant also challenges the legal sufficiency of the evidence. Although this argument was not preserved by his general motions to dismiss for failure to present a prima facie case (*see People v Terry*, 85 AD3d at 1486), we " 'necessarily review the evidence adduced as to each of the elements of the crimes in the context of our review of defendant's challenge regarding the weight of the evidence' for which there is no preservation requirement" (*People v Newkirk*, 75 AD3d 853, 855 [2010], *lv denied* 16 NY3d 834 [2011], quoting *People v Caston*, 60 AD3d 1147, 1148-1149 [2009] [citation omitted]).

records. In general, mental health records are confidential and will not be discoverable where sought as "a fishing expedition searching for some means of attacking the victim's credibility" (*People v Brown*, 24 AD3d 884, 887 [2005], *lv denied* 6 NY3d 832 [2006]; *see People v Gissendanner*, 48 NY2d 543, 550 [1979]; *People v Bush*, 14 AD3d 804, 805 [2005], *lv denied* 4 NY3d 852 [2005]). Access will be provided, however, where a defendant can demonstrate a good faith basis for believing that the records contain "data relevant and material to the determination of guilt or innocence," a decision which will rest "largely on the exercise of a sound discretion by the trial court" (*People v Gissendanner*, 48 NY2d at 548; *see People v Plaza*, 60 AD3d 1153, 1154-1155 [2009], *lv denied* 12 NY3d 919 [2009]). Here, defendant requested all of the victim's mental health records, based on the disclosure by the People that the victim has a history of mental illness, had been the victim of sexual abuse on at least three prior occasions and had attempted suicide in the months leading up to the trial.

Under these circumstances, County Court appropriately conducted an in camera review of the victim's records and partially granted defendant's request by turning over those records that the court found were pertinent to the case. In this manner, the court properly balanced defendant's 6th Amendment right to cross-examine an adverse witness and his right to any exculpatory evidence against the countervailing public interest in keeping certain matters confidential (*see People v Gissendanner*, 48 NY2d at 549-551; *People v Boyea*, 222 AD2d 937, 938-939 [1995], *lv denied* 88 NY2d 934 [1996]; *see also People v Fuentes*, 12 NY3d 259, 263-265 [2009]). We have reviewed the victim's voluminous mental health records and conclude that the court provided an appropriate sample of documents that covers all of the victim's relevant and material mental health issues.

The dissent, in performing its review of the victim's mental health records, has unearthed some documents that were not disclosed to defendant and are relevant to the victim's competence to testify, in particular, references to short-term memory loss, such as her inability to recall events after she has had a temper tantrum, and a suggestion that she forgets good experiences with a person if they are succeeded by a negative experience. We find, however, that it was not an abuse of discretion for County Court to fail to disclose these documents. Indeed, given the limited impact these additional relevant records have when compared to the amount of material that was disclosed to the defense regarding the victim's hallucinations, various

diagnosed conditions, medications, preoccupation with sex, poor judgment, dangerous behaviors, self-abuse, violent outbursts, etc., we cannot find that County Court so failed in its diligent efforts to cull through thousands of pages of mental health records to balance the victim's rights against defendant's rights such as would constitute an abuse of discretion.[3]

Other documents that the dissent asserts should have been disclosed were redundant in light of those records that were disclosed. For example, additional documents relating to the victim's poor perception and insight were properly withheld because the sample documents disclosed contain multiple references to her poor impulse control and lack of judgment, especially in sexual interactions and Internet exchanges. Likewise, the victim's experiences with seizures and flashbacks were disclosed in documents turned over to the defense. An incident where the victim was found wandering on a highway and not able to remember how she got there was also noted in one of the documents that was disclosed.

Additionally, it was not necessary for County Court to disclose those few references in the victim's mental health records that suggest that she may have falsely accused her father of sexually abusing her when she was 13. Assuming that the records contain enough information to suggest a false allegation,[4] this evidence would not be admissible under New York's Rape Shield Law because it is far too different and attenuated from the circumstances of the present allegation of rape to " 'suggest a pattern casting substantial doubt on the validity of the charges made by the victim' or 'indicate a significant probative relation to such charges' " (*People v Blackman*, 90 AD3d at 1310 [citations omitted]; *see People v Mann*, 41 AD3d 977, 978-979 n

---

**3.** The vast majority of the documents disclosed were dated, revealing a picture of the victim's mental health between the ages of 13 and 18. One of the documents disclosed contains an assessment of the victim taken on the day of the rape.

**4.** The victim's mental health records reveal a very troubled relationship with her father, who physically abused her during a limited amount of time during the victim's lifetime—approximately six months when the victim was 13—when he resided with the family. The full extent of details of the abuse alleged by the victim are that he "tried to rape her," describing that he "pinned her up against the wall in a sexual position and she can not recall how she got away." Her mental health records do not contain any other details from the victim pertaining to sexual abuse or that she ever recanted her statements. The only suggestions that the allegation was false come from a mental health worker at a local childcare institution that was treating the victim when she was 13 who noted, without elaboration, that the allegation was "unfounded" and the mother's reported opinion that the father never sexually abused the victim.

[2007], *lv denied* 9 NY3d 924 [2007]). We detect no pattern of behavior by comparing this remote, alleged false claim of sexual abuse by the victim against her alcoholic, physically abusive father, with her assertion that she was date-raped by defendant (*see People v Mandel*, 48 NY2d 952, 953 [1979] [prior false allegations of rape inadmissible where "no showing was made that the particulars of the complaints, the circumstances or manner of the alleged assaults or the currency of the complaints were such as to suggest a pattern casting substantial doubt on the validity of the charges made by the victim in this instance"], *appeal dismissed and cert denied* 446 US 949 [1980]; *People v McKnight*, 55 AD3d 1315, 1316 [2008] [insufficient proof that alleged prior false accusations of sexual abuse were "suggestive of a pattern that casts doubt on the validity of, or bore a significant probative relation to, the instant charges" (internal quotation marks and citations omitted)], *lv denied* 11 NY3d 927 [2009]; *compare People v Hunter*, 11 NY3d 1, 6 [2008] [noting the similarities between recent, allegedly false accusations and those alleged against the defendant]). When determining whether a trial court abused its discretion, we must necessarily consider whether or not the document, if turned over, could have had any impact on the trial. Here, there can be no abuse of discretion as the information contained in the documents would not have been admissible, and we cannot envision how such information might have led to other material and admissible evidence.

Defendant also argues that County Court committed reversible error by precluding him from examining the victim about her hypersexuality. When defense counsel asked the victim on cross-examination if, at some point in time, she had been diagnosed as hypersexual, the court sustained the People's objection as to form and directed counsel to rephrase the question. Counsel was unable to do so in a way to avoid objection and moved on. "Evidence of a victim's sexual conduct shall not be admissible in a prosecution for [a sex] offense" unless it meets one of the enumerated statutory exceptions (CPL 60.42). Here, the victim's mental health records indicate that she exhibits hypersexual behavior in that she is inappropriately focused on sex in conversation with others, and that such behavior is a symptom of her bipolar disorder. Defendant did not introduce medical evidence or expert testimony to establish that hypersexuality is a mental illness that would impact the victim's credibility or control her behavior; indeed, all references to the victim's "hypersexuality" in her medical history are to her wholly voluntary inappropriate, promiscuous behavior—conduct intentionally designed to shock and draw attention—which is

precisely the kind of evidence the Rape Shield Law prohibits (*see* CPL 60.42; *People v Simonetta*, 94 AD3d 1242, 1246 [2012], *lv denied* 19 NY3d 1029 [2012]). Under these circumstances, we discern no abuse of discretion in the court's limitation on the scope of cross-examination of the victim (*see People v Halter*, 19 NY3d 1046, 1049 [2012]; *People v Simonetta*, 94 AD3d at 1246; *People v Scott*, 67 AD3d 1052, 1054 [2009], *affd* 16 NY3d 589 [2011]; *People v Passenger,* 175 AD2d 944, 946 [1991]).

In any event, defendant was permitted to introduce evidence of the victim's hypersexuality on the record through the testimony of the victim's mother, defendant and Calhoun.[5] Accordingly, the jury had this information when assessing the evidence against defendant. We also hold that County Court's refusal to permit defendant to cross-examine the victim's mother regarding various events at which the victim exhibited undisciplined behavior, while permitting questions regarding the victim hearing voices, wandering around outside in her pajamas, sensing dead people and visualizing her deceased grandfather, demonstrated a sound exercise of discretion in controlling the scope of cross-examination (*see People v Carter*, 50 AD3d 1318, 1321 [2008], *lv denied* 10 NY3d 957 [2008]).

We turn next to defendant's claim that he was deprived of the effective assistance of counsel and, in doing so, address several substantive arguments that defendant asserts on appeal that were not preserved by an appropriate objection at trial. To establish this claim, defendant must show that counsel failed to provide meaningful representation and that there is an " 'absence of strategic or other legitimate explanations' for counsel's allegedly deficient conduct" (*People v Caban*, 5 NY3d 143, 152 [2005], quoting *People v Rivera*, 71 NY2d 705, 709 [1988]).

Defendant asserts that counsel should have objected to the introduction of testimony from police officers that the victim reported being sexually assaulted on the basis that these hearsay statements improperly bolstered the victim's testimony (*see People v Buie*, 86 NY2d 501, 510-511 [1995]; *People v Caba*, 66 AD3d 1121, 1123 [2009]). Significantly, defendant does not directly dispute that the admitted statements fall within the prompt outcry exception to the hearsay rule (*see People v Rosario*, 17 NY3d 501, 511 [2011]; *People v Perkins*, 27 AD3d 890, 892-893 [2006], *lvs denied* 6 NY3d 897 [2006], 7 NY3d 761 [2006]) but, instead, argues the prejudicial impact of this evidence in light of the number of prompt outcry statements admit-

---

5. Calhoun was even permitted to provide a layperson's definition, explaining that hypersexual means "she [is] very hot in the pants."

ted and County Court's failure to provide a limiting instruction as to its relevance. Inasmuch as the outcry testimony was accurately limited to the fact that a complaint was made and the court gave an appropriate prompt outcry instruction in its charge to the jury (*see* CJI2d[NY] Prompt Outcry; *People v Bernardez*, 85 AD3d 936, 938 [2011], *lv denied* 17 NY3d 857 [2011]), we discern no significant error in counsel's decision not to object to this testimony or ask for a limiting instruction.

Likewise, defense counsel did not err in failing to object to the introduction of evidence of the victim's statements to medical personnel. These statements squarely fall within the medical records exception to the hearsay rule because they were germane to diagnosis and treatment (*see People v Wright*, 81 AD3d 1161, 1164 [2011], *lv denied* 17 NY3d 803 [2011]; *People v Thomas*, 282 AD2d 827, 828 [2001], *lv denied* 96 NY2d 925 [2001]; *see also* CPLR 4518; CPL 60.10). Accordingly, the testimony and records pertaining to the victim's emergency room visit on the night of the rape were properly admitted (*see People v Ortega*, 15 NY3d 610, 617 [2010]; *People v Wright*, 81 AD3d at 1164).

We also discern no error in defense counsel's failure to object to the introduction of evidence of defendant's criminal history inasmuch as a *Sandoval* hearing was held prior to trial where County Court precluded inquiry into 22 of the 27 prior offenses proffered by the People. Additionally, the People did not exceed the scope of the court's limited *Sandoval* ruling during defendant's cross-examination, and the court informed the jury that it could only consider the crimes with regard to his credibility (*see People v Nash*, 87 AD3d 757, 759 [2011], *lv denied* 17 NY3d 954 [2011]). Likewise, although defense counsel did not object to the People's use of defendant's statement for the first time during his cross-examination, such objection would have been fruitless as the statement was admissible to impeach him (*see People v Martin*, 8 AD3d 883, 886 [2004], *lv denied* 3 NY3d 677 [2004]).

Defendant makes numerous other, specific objections to defense counsel's choices in representing him. We have considered them carefully and find each to be the product of a legitimate trial strategy, or to concern matters outside the record, and, therefore, are more properly reviewed on a motion pursuant to CPL article 440 (*see People v McCray*, 96 AD3d 1160, 1161 [2012], *lv denied* 19 NY3d 1104 [2012]). Counsel zealously advocated for defendant, made appropriate pretrial motions, pursued a reasonable defense theory, thoroughly cross-examined witnesses and made appropriate evidentiary objections; thus, viewing the record as a whole, defendant received meaningful

representation (*see People v Benevento*, 91 NY2d 708, 712 [1998]; *People v Evans*, 81 AD3d 1040, 1041 [2011], *lv denied* 16 NY3d 894 [2011]).

Many of defendant's remaining contentions on appeal do not warrant extended discussion. His claim that bail was improperly denied is moot in light of his conviction and subsequent incarceration (*see Matter of Varela v Stein*, 37 AD3d 1001, 1001 [2007]). His contentions that County Court improperly denied his second request for new counsel, and that deficiencies existed in the grand jury proceedings, the felony complaint, the indictment and the presentence report lack a factual basis in the record. Defendant's allegations of prosecutorial misconduct do not demonstrate a " 'flagrant and pervasive pattern' of misconduct" warranting reversal (*People v Hunt*, 39 AD3d 961, 964 [2007], *lv denied* 9 NY3d 845 [2007], quoting *People v McCombs*, 18 AD3d 888, 890 [2005]).

Finally, we turn to defendant's request that we modify his sentence on the basis that it is unduly harsh and excessive. Given the violent nature of this crime against a particularly vulnerable victim, defendant's extensive criminal history— including three prior felonies and a prior sexual offense—and the fact that defendant's own conduct prevented any argument for leniency to be made as he refused to permit counsel to speak on his behalf at sentencing or to address County Court himself, we cannot find "an abuse of discretion or extraordinary circumstances warranting reduction" (*People v Walker*, 266 AD2d 727, 728 [1999], *lv denied* 96 NY2d 909 [2001]; *see People v Jones*, 39 NY2d 694, 697 [1976]). Nor are we persuaded that the disparity between the ultimate sentence imposed and a very favorable plea offered prior to trial necessitates the conclusion that defendant was penalized for exercising his right to a trial where, as here, the attractive plea offer is easily justified by the fact that the People's proof largely rested on the credibility of the victim, who was a troubled, emotional young woman (*see People v Blond*, 96 AD3d 1149, 1153-1154 [2012], *lv denied* 19 NY3d 1101 [2012]; *People v Maldonado*, 205 AD2d 933, 933 [1994] *lv denied* 84 NY2d 908 [1994]; *compare People v Williams*, 40 AD3d 1364, 1367 [2007], *lv denied* 9 NY3d 927 [2007]).

We have considered defendant's remaining contentions and find them to be without merit.

Stein and Garry, JJ., concur.

McCarthy, J. (dissenting). Defendant is entitled to a reversal of his judgment of conviction because his 6th Amendment rights to confront and cross-examine adverse witnesses were violated by County Court's failure to turn over to defendant certain crit-

ical mental health records pertaining to the victim. Defendant was entitled to the undisclosed records pursuant to controlling Court of Appeals precedent. The undisclosed records all raise issues that would affect the victim's credibility or her ability to recall events, and some of the undisclosed records would be extremely damaging to the People's case. We, therefore, respectfully dissent.

County Court followed the proper procedure by conducting an in camera review of the victim's mental health records to balance defendant's 6th Amendment rights to confront and cross-examine adverse witnesses with the public interest in keeping certain matters confidential (*see People v Gissendanner*, 48 NY2d 543, 549-551 [1979]; *People v Boyea*, 222 AD2d 937, 938-939 [1995], *lv denied* 88 NY2d 934 [1996]). Confidential records should only be turned over to the defense if they contain information that is "relevant and material to the determination of guilt or innocence" (*People v Gissendanner*, 48 NY2d at 548), such as "evidence that the victim has a history of hallucinations, sexual fantasies or false reports of sexual attacks" (*People v Fish*, 235 AD2d 578, 580 [1997], *lv denied* 89 NY2d 1092 [1997]; *see People v Brown*, 24 AD3d 884, 887 [2005], *lv denied* 6 NY3d 832 [2006]).

As the majority notes, the 28 pages of mental health records provided to the defense by County Court—out of the thousands of pages reviewed in camera—contain statements about the victim's history of psychiatric hospitalizations, hallucinations and preoccupation with talking about sex. Contrary to the majority's conclusion, however, these 28 pages do not "cover all of the victim's relevant and material mental health issues." We acknowledge that some of the undisclosed records would have been, in some respects, redundant, as they include, among other things, some of the same material as the records that were provided.[1] But, contrary to the majority's assertion, criminal defendants are entitled to more than just a "sample" of documents addressing a key witness's mental health problems that could affect his or her testimony. In a case such as this, which the majority correctly characterizes as presenting "a classic he-

---

1. County Court provided records noting that the victim experienced visual and auditory hallucinations at different times between 2003 and 2007. Other records indicated earlier hallucinations, gave more details on some of the more recent ones and noted that the victim denied that what she sensed was a hallucination. Although those records probably should have been turned over as well, we will not go so far as to say that it was an abuse of discretion for the court to have limited the number of documents it provided that contain similar information. On remittal, however, we would provide those documents to defendant as well.

said she-said credibility determination," defendant must be allowed to consider and explore all legitimate avenues of information relevant to his defense and to the victim's testimony and potential cross-examination. The question here is not whether County Court should have permitted the defense to enter certain documents into evidence or ask the victim about certain topics at trial (*compare People v Mandel*, 48 NY2d 952, 953-954 [1979], *appeal dismissed and cert denied* 446 US 949 [1980]), but whether the court should have provided defendant certain records that would have allowed the defense to investigate information contained therein to determine if admissible evidence could be gathered or proper questions could be formulated. More records should have been provided to defendant, addressing all of the victim's relevant mental health issues, so that defense counsel could fully investigate, prepare and advocate for defendant.[2]

Certain records that were not provided to defendant relate to the victim's ability to recall events. "Where a primary prosecution witness is shown to suffer from a psychiatric condition, the defense is entitled to show that the witness's capacity to perceive and recall events was impaired by that condition" (*People v Baranek*, 287 AD2d 74, 78 [2001] [citations omitted]; *see People v Rensing*, 14 NY2d 210, 213-214 [1964]). While some disclosed records mentioned that the victim suffered from epilepsy or grand mal seizures in the past, those records did not associate her seizure activity with possible memory loss as the undisclosed records did. A July 2006 record[3] discussed her history of seizures, which condition was treated successfully with medication, but raised a question of possible seizure activity due to episodes where she ended up in places and could not remember going there, such as walking along a busy highway. An August 2006 record also referred to times when the victim wound up on a highway and spent the night in a shelter but could not remember how she got there. Similarly, a June 2006 record noted "recent dissociative[4] episodes [without] visible seizure activity" for which the author sought a neurological

---

**2.** Some of the records that were disclosed did not contain the name of the author, the source of information, the date they were created or where the original record was located. Such information should have been provided, if available (and it generally was), so that defense counsel could place the information in context. For example, hallucinations in 2003 may not be as relevant or important as hallucinations that occurred closer in time to the incident.

**3.** None of the records referred to in this dissent by a specific month and year were disclosed to defendant; all of them should have been.

**4.** This term refers to a detachment from one's surroundings, consciousness, memory or identity.

consultation. An October 2006 record noted "significant short term memory loss." According to a May 2007 record, the victim talked about times when she was out of control and related how it was sometimes scary to learn afterward what she had done or said because, at times, she has had no recollection of the events. A progress note from June 2008 includes information given by the victim's mother that the victim acted strangely, related a feeling of bugs crawling on her face and said that she had taken morphine. An August 2008 psychiatric assessment found that the victim's memory is selective, namely that she admits not being able to remember good experiences with a person if she had bad experiences with that person. This last record could be especially important, considering defendant's testimony that they had consensual sex and struggled afterward when the victim attempted to take his money. Defense counsel could have explored whether the victim was unable to remember any good experiences with defendant due to this subsequent bad experience of the struggle over money, making defendant's testimony more plausible (see People v Hunter, 11 NY3d 1, 6-7 [2008]). All of these records raise questions as to the victim's ability to accurately recall the details of the alleged rape, making the records relevant and material to the determination of defendant's guilt or innocence (see People v Baranek, 287 AD2d at 79). These records were not merely redundant, because the records provided by County Court did not address these topics. Thus, defendant was entitled to all of these undisclosed records.

Records also mention that the victim has suffered flashbacks from previous sexual abuse. This was noted in July 2006. While the majority correctly notes that a disclosed record from June 2006 mentions that the victim reported flashbacks, it is unclear if that record is relating the flashbacks to prior sexual abuse or physical abuse. Disclosure of additional records could have helped to clarify that ambiguity. A March 2008 record mentioned that the victim was "experiencing increased flashbacks of prior abuse." Another record from that same month discussed the flashbacks and noted that they were triggered by, among other things, role playing in consensual sex with her boyfriend. This is another topic that defense counsel could have investigated in preparing for trial.

Additionally, a July 2006 record included the summary that the victim had "a very poor perception of reality with distortions in her interpersonal relationships." That record also noted the victim's wishful thinking regarding relationships with males that she had just met, that she offered sexual favors to make friends, and that she became extremely upset when these

relationships did not last. Similarly, a January 2008 record noted that the victim was adamant that she had a realistic plan for her new boyfriend—whom she met online but had never met in person, was more than 10 years older than her and lived out of state—to move to New York within a month and live with her. The therapist who wrote the note found that the victim was fixated on this fantasy, which the victim considered her reality, of a relationship with this man she recently met online. A June 2008 record indicated that the victim was invested in the fantasy of an ideal relationship. Proof of these fantasies and misconceptions of her relationships with males was also relevant and material to the defense.

Also relevant were records of prior allegations of sexual abuse that were possibly false. Evidence of a prior rape complaint is admissible if there is sufficient proof that the complaint was false, and it suggests "a pattern casting substantial doubt on the validity of the charges made by the victim" or "indicate[s] a significant probative relation to such charges" (*People v Mandel*, 48 NY2d at 953; *see People v Blackman*, 90 AD3d 1304, 1310 [2011], *lv denied* 19 NY3d 971 [2012]; *People v Pereau*, 45 AD3d 978, 980 [2007], *lv denied* 9 NY3d 1037 [2008]). In footnote 4 of its opinion, the majority mentions one October 2006 undisclosed mental health record containing information about a possible false allegation of sexual abuse, but dismisses the victim's allegations that her father "tried to rape her" and "pinned her up against the wall in a sexual position" by saying that "[t]he only suggestions that the allegation was false" came from a mental health worker who listed the allegation as "unfounded" and the victim's mother's "opinion that the father never sexually abused the victim." Although the mental health records do not contain more details of the alleged attack, the records do not indicate that the mother's statements are mere "opinion"; one states that the mother "did continue to deny that [the victim's] father ever sexually abused her." This supports disclosure to defendant so he could investigate the details of the purportedly false allegations prior to trial. Considering that the mother lived with both her husband—who is the victim's father and the alleged perpetrator—and the victim, the mother's statement that the abuse did not happen was an outright denial by a fact witness rather than a mere "opinion." When a female claims that a male "tried to rape her," the alleged conduct is inherently sexual in nature. Either the victim's mother and a mental health worker concluded that the victim fabricated the allegations or they blindly ignored clear allegations of sexual abuse. The physical abuse by the father was apparently reported to authorities and resulted in an indicated report of abuse; the

records do not clearly state whether the alleged attempted rape was similarly reported or investigated. The record mentioned by the majority states on its face that the victim's sex abuse allegations against her father were "unfounded," but it is unclear whether this term was used in its legal sense, as in the context of child abuse allegations (*see* Social Services Law § 422 [5]; 18 NYCRR 433.2 [l]).

The majority states repeatedly that this evidence would not be admissible, but that is not the standard. Regardless of admissibility at trial, pursuant to controlling Court of Appeals case law, defendant was entitled to records that are relevant to a potentially false allegation of sexual abuse so that he could have investigated that claim prior to trial, consistent with his 6th Amendment right to cross-examine his accuser. Defendant was not even aware that this report existed, but he could have tried to establish the falsity of this prior claim if the record were disclosed, and he would only be permitted to discuss it in front of the jury if he "established a good faith 'basis for the allegation that the prior complaint was false' " (*People v Bridgeland*, 19 AD3d 1122, 1123 [2005], quoting *People v Gozdalski*, 239 AD2d 896, 897 [1997], *lv denied* 90 NY2d 858 [1997]). The first mention of alleged sexual abuse of the victim by her father appears in a July 2004 record, after she revealed details of an attempted rape by him. Throughout numerous intake reports and mental health histories taken during the ensuing years, answers to a question about past physical and sexual abuse include statements about physical abuse by the father and sexual abuse by others,[5] but they do not mention sexual abuse by the father. Other records mention possible sexual abuse in the home, without explanation.

The majority refers to the lack of proof that the victim ever recanted these allegations. Two years after this undisclosed 2006 report, the victim continued to insist that her father sexually abused her. A March 2008 record discussed the victim's regressive behavior as related to her "recent disclosures" of sexual abuse by her father.[6] That same record noted that the victim's mother "was able to be more genuine and spoke openly about past traumas that [the victim] experienced," but—despite the victim's insistence and lack of recantation—the note also

---

**5.** The answers were also inconsistent regarding her prior sexual abuse history that apparently is not contested, sometimes mentioning an incident when she was seven years old, sometimes mentioning an incident when she was 12, and sometimes including both incidents.

**6.** This record does not refer to the 2004 or 2006 records of the victim's prior disclosure.

stated that the mother continued to deny that the victim was ever sexually abused by her father. The mother had been separated from the father since 2004 and the record discloses that she harbored ill feelings towards him, making it unlikely that the mother was denying the abuse out of loyalty to him. A July 2008 record also notes that the victim has alluded to past sexual abuse that was not substantiated by the mother.

These records alone may have provided defendant with a good faith basis that the victim's prior rape allegation against her father was false. Even if they were not sufficient to prove falsity by themselves, defense counsel could have used these records as the basis for an investigation and a subpoena of child protective services records regarding unfounded reports (*see generally* Social Services Law § 422 [4] [A] [e]). Although there are differences between a complaint of attempted rape of a young teen by her father and a complaint by an older teen of date rape, the circumstances of the prior allegation here suggest a pattern, casting doubt on the validity of the charge at issue at defendant's trial (*see People v Bridgeland*, 19 AD3d at 1123-1124; *compare People v Hunter*, 11 NY3d at 7), and "indicate a significant probative relation to such charge[ ]" (*People v Mandel*, 48 NY2d at 953). While the majority finds the rape by defendant as too unlike the alleged attempted rape by the victim's father, at the very least defendant had a right to be advised of the prior allegation and provided an opportunity to address the similarity or presence of a pattern. When considered in conjunction with the many undisclosed records regarding the victim's impaired memory, hallucinations, ability to recall events, sexual fantasies and flashbacks, the failure to disclose these records was error. The undisclosed records all raise issues that would affect the victim's credibility or ability to recall events, and the allegations of prior sexual assault—if proven to be false—would be extremely damaging to the People's case.[7] Regardless of their admissibility at trial, defendant was entitled to be aware of and afforded the opportunity to investigate these matters prior to trial.[8] By not disclosing these records, County Court deprived defendant of the ability to fully prepare his defense, in violation of his 6th Amendment rights to confront and cross-examine the key adverse witness. He is, therefore, entitled to a new trial.

---

**7.** Prior to trial, the People offered defendant a plea to a misdemeanor and time served, presumably based on the People's recognition of the serious problems with the victim's credibility.

**8.** Compared to the 28 pages that County Court provided to the defense, there are an additional 34 pages that, pursuant to prevailing case law, should also have been provided. By our calculations, this means that when preparing his defense prior to trial, defendant had less than 50% of the documents to which he was entitled.

Mercure, J.P., concurs. Ordered that the judgment is affirmed.