[12 NE3d 1079, 989 NYS2d 649]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TERENCE McCRAY, Appellant.

Argued February 13, 2014; decided May 1, 2014

194

## POINTS OF COUNSEL

*Paul J. Connolly*, Delmar, for appellant. I. County Court violated appellant's right to confront and cross-examine witnesses and otherwise to prepare his defense by failing to disclose all of complainant's mental health records that were potentially relevant to her credibility or to her account of the alleged crime, or which could have led to discovery of potentially admissible evidence or aided in cross-examining prosecution witnesses. (*Crane v Kentucky*, 476 US 683; *California v Trombetta*, 467 US 479; *Olden v Kentucky*, 488 US 227; *Delaware v Van Arsdall*, 475 US 673; *Davis v Alaska*, 415 US 308; *Douglas v Alabama*, 380 US 415; *Brady v Maryland*, 373 US 83; *Strickler v Greene*, 527 US 263; *United States v Gil*, 297 F3d 93; *Johnson v Folino*, 705 F3d 117.) II. County Court erred in not reviewing the records of complainant's fall 2009 hospitalization and in not disclosing to appellant such of those records as could potentially aid the defense. (*People v Bailey*, 58 NY2d 272; *People v Jackson*, 291 AD2d 930, 98 NY2d 677; *People v Gissendanner*, 48 NY2d 543; *People v Yavru-Sakuk*, 4 NY3d 814.) III. Defense counsel's failure to object to the multiple out-of-court statements of complainant claiming to have been raped or sexually assaulted, recounted by the police and in medical and paramedical records, and his failure to request limiting instructions as to the statements to the police, rendered him ineffective under the State and Federal Constitutions. (*People v Rice*, 75 NY2d 929; *People v Seit*, 86 NY2d 92; *People v O'Sullivan*, 104 NY 481;

*People v Deitsch*, 237 NY 300; *People v Rosario*, 17 NY3d 501; *People v McDaniel*, 81 NY2d 10; *People v Shepherd*, 83 AD3d 1298; *People v Felix*, 32 AD3d 1177, 7 NY3d 925; *People v Fabian*, 213 AD2d 298, 85 NY2d 972; *People v Santos*, 243 AD2d 276.) IV. County Court committed reversible error by precluding appellant from examining complainant about a diagnosis that she was hypersexual. (*Crane v Kentucky*, 476 US 683; *California v Trombetta*, 467 US 479; *Davis v Alaska*, 415 US 308; *Douglas v Alabama*, 380 US 415; *People v Baranek*, 287 AD2d 74; *People v Douglas*, 29 AD3d 47, 6 NY3d 847; *People v Rivera*, 138 AD2d 169; *People v Crimmins*, 36 NY2d 230.) V. County Court committed reversible error in sustaining prosecution objections to multiple defense questions of complainant and complainant's mother, which were designed to elicit testimony as to complainant's erratic and unstable behavior, and thus to aid the jury in assessing her credibility. (*People v Klem*, 80 AD3d 777; *People v Baranek*, 287 AD2d 74; *People v Dudley*, 167 AD2d 317; *People v Phipps*, 220 AD2d 238; *People v Tucker*, 171 Misc 2d 1; *People v Cesar G.*, 154 Misc 2d 17; *People v Rensing*, 14 NY2d 210; *People v Manzanillo*, 145 Misc 2d 504; *People v Plaisted*, 2 AD3d 906, 2 NY3d 744; *People v Carter*, 50 AD3d 1318.)

*P. David Soares, District Attorney*, Albany (*Steven M. Sharp* of counsel), for respondent. I. County Court's in camera review appropriately balanced defendant's due process rights and the victim's privacy rights and represented a sound exercise of discretion. (*Brady v Maryland*, 373 US 83; *People v Bryce*, 88 NY2d 124; *Giglio v United States*, 405 US 150; *People v Fuentes*, 12 NY3d 259; *People v Vilardi*, 76 NY2d 67; *People v Gissendanner*, 48 NY2d 543; *People v Tissois*, 72 NY2d 75; *People v De Jesus*, 69 NY2d 855; *Pennsylvania v Ritchie*, 480 US 39; *Jaffee v Redmond*, 518 US 1.) II. Defendant was responsible for obtaining the victim's medical records relative to her hospitalization in the fall of 2009, not the court or the People. (*People v Chatman*, 186 AD2d 1004; *People v Kelly*, 62 NY2d 516; *People v Hayes*, 17 NY3d 46; *People v Reedy*, 70 NY2d 826; *People v Sealey*, 239 AD2d 864; *People v Darling*, 276 AD2d 922.) III. Defendant received effective assistance of counsel. (*People v Benevento*, 91 NY2d 708; *People v Felder*, 47 NY2d 287; *People v Claudio*, 83 NY2d 76; *People v Hobot*, 84 NY2d 1021; *People v Baldi*, 54 NY2d 137; *People v Henry*, 95 NY2d 563; *People v Flores*, 84 NY2d 184; *People v Aiken*, 45 NY2d 394; *People v Rivera*, 71 NY2d 705; *People v Angelakos*, 70 NY2d 670.) IV. County Court did not preclude defendant from questioning witnesses about the victim's purported hypersexuality. (*People v*

*Williams*, 81 NY2d 303; *People v Corby*, 6 NY3d 231; *People v Scott*, 16 NY3d 589; *People v Halter*, 19 NY3d 1046.) V. County Court properly sustained objections to questioning the victim's mother about incidents that were only relevant to the victim's credibility. (*People v Pavao*, 59 NY2d 282; *People v Duffy*, 36 NY2d 258; *People v Klem*, 80 AD3d 777.) VI. Defendant's claims in his pro se supplemental brief are without merit.

### OPINION OF THE COURT

SMITH, J.

Defendant, prosecuted for rape, sought disclosure of the complainant's mental health records. The trial court reviewed the records in camera and disclosed only a few of them. We hold that the court did not abuse its discretion.

### I

Defendant, 40 years old, and the complainant, 18, met for the first time in April 2009. They had several telephone conversations after their first meeting, and agreed to go on a date on May 26, 2009.

Both of them testified to what happened that evening, and their accounts, up until the final, critical events, match in many respects. They visited a friend of defendant at his home, tried unsuccessfully to go to a bar (which excluded the complainant because of her age) and then went to the home of another of defendant's friends, who left them to themselves. While there, they kissed, and touched each other intimately, but did not have intercourse. Defendant then led the complainant to an abandoned house.

Some time later, the complainant called 911 from a pay phone near the house, weeping and struggling to speak. She said that defendant had beaten her, made her beg for her life, and raped her. A police officer who approached her while she was on the phone saw blood on her clothes and her face. Photographs and hospital records show that she had abrasions and bruises on her left arm and left cheek, and lacerations to the inside of her mouth. Defendant, meanwhile, had gone to the home of a friend near the abandoned house, and (according to the friend's testimony) banged on the door and asked to be let in because a woman was "exposing herself and . . . chasing him." Defendant had a bite mark on his forearm.

The key issue at trial, of course, was what happened in the abandoned house. The complainant testified that defendant

pinned her against a wall, forced his tongue into her mouth, rubbed against her and demanded sex. She refused and a struggle followed, in which each hit the other in the face, defendant choked the complainant and the complainant bit him. Eventually, the complainant said, she "gave in" and "let him have it because he said if I did, I could live." They had intercourse, and she left the house.

Defendant testified that the couple engaged in foreplay and consensual sex. Afterwards, the complainant said "I want some money" or "I want to be compensated." This led to a loud exchange of epithets, after which, defendant said, the complainant "grabbed my pants and . . . started heading out the door with them." Defendant tackled her, and her face hit the floor. He then sat on her back, tried to retrieve his pants from underneath her, and noticed that she had removed some of his money and had it in her hand. As he tried to wrench it away, she bit him. Eventually, he retrieved his pants and his money, and the complainant got up and walked out.

The outcome of the case obviously depended on which witness the jury believed. Seeking information that would undermine the complainant's credibility, defendant asked before trial that the People be directed to obtain her mental health records and turn them over to the defense. The court directed instead that the records be submitted to it in camera. From the thousands of documents submitted, the court selected 28 pages for disclosure, and withheld the rest.

The records that were disclosed showed, and the jury was informed at trial, that the complainant had very significant mental health problems. Her diagnoses, as summarized in her own testimony, included "Bipolar, Tourettes, post-traumatic stress disorder, epilepsy." It was also brought out that she suffered from attention deficit disorder and hypersexuality; that she had reported that she "visualized" or "sense[d] the presence of" dead people; that she had cut her flesh with sharp objects; that her bipolar disorder caused her "on occasion" to be "explosive and angry" and to "physically strike out at people"; that at the time of the incident she was taking medications, was receiving treatment from a mental health facility, and was also seeing a counselor weekly or biweekly; that she failed "once in a while" to take her medications, and that on the night of the alleged rape she could not remember whether she had taken them that day; that, after the alleged rape and before the trial, she had been hospitalized for an overdose of drugs; and that

that was not her first suicide attempt, though she said it was her first "serious" one.

Defendant was convicted of rape. The Appellate Division affirmed, holding among other things, after examining the undisclosed documents, that the trial court did not err in withholding them (*People v McCray*, 102 AD3d 1000 [3d Dept 2013]). Two Justices dissented, concluding that the undisclosed records "raise issues that would affect the victim's credibility or her ability to recall events" and that some of them "would be extremely damaging to the People's case" (*id.* at 1011). A Justice of the Appellate Division granted leave to appeal, and we now affirm.

## II

While defendant presents the issue as one of interference with his rights of confrontation and cross-examination, we view this as essentially a *Brady* case (*Brady v Maryland*, 373 US 83 [1963]; *see Pennsylvania v Ritchie*, 480 US 39, 56 [1987] [evaluating under *Brady* the question of whether confidential investigative files concerning child abuse must be disclosed to a criminal defendant]). Under *Brady*, a defendant is entitled to the disclosure of evidence favorable to his case "where the evidence is material" (373 US at 87). In New York, the test of materiality where, as here, the defendant has made a specific request for the evidence in question is whether there is a "reasonable possibility" that the verdict would have been different if the evidence had been disclosed (*People v Vilardi*, 76 NY2d 67, 77 [1990]).

This case differs from the typical *Brady* case in that it involves confidential mental health records, and the decision to deny disclosure was made not by a prosecutor, but by a judge after an in camera review of the records sought. In such a case, the trial court has a measure of discretion in deciding whether records otherwise entitled to confidentiality should be disclosed (*see People v Gissendanner*, 48 NY2d 543, 548 [1979]).

In sum, the issue here is whether the trial court abused its discretion in finding defendant's interest in obtaining the records to be outweighed by the complainant's interest in confidentiality; and defendant's interest could be outweighed only if there was no reasonable possibility that the withheld materials would lead to his acquittal. Having examined those materials, we conclude that the court did not abuse its discretion.

As to most of the documents in question, we have no hesitation in agreeing with the courts below that they are either

cumulative or of little if any relevance to the case. The jury knew that the complainant had "visualized" her deceased grandfather and had said that she "could sense the presence of dead people." The undisclosed records contain other examples of what could be called hallucinations or distorted perceptions, but the other examples were no clearer or more dramatic than the ones the defense already had; the trial court could reasonably conclude they would add little force to defendant's attacks on the complainant's credibility.

There are also many references in the undisclosed documents to the complainant's tendency to misremember or misunderstand events. It is hard to imagine, however, a juror who could attribute the complainant's testimony here—a claim of rape, made immediately after what defendant testified was consensual sex followed by a dispute over payment—to a failure of recollection or a misunderstanding, however susceptible to those failings the complainant may have been. She certainly did not fantasize or misremember that she and defendant had a violent encounter: they both had the wounds to prove it. And their descriptions of that encounter are so starkly different that if one version is not a lie, the other must be. With one possible exception, which we discuss below, there is nothing in the undisclosed records suggesting that the complainant had a tendency to make accusations she knew to be false.

The undisclosed records do show that the complainant had made several previous complaints of sexual abuse. But—again with one exception—these were not complaints that anyone had used violence to force sex on her. And—subject to the same exception—nothing in the records suggests that the complaints were untrue. Certain of them may show that, before the complainant reached the age of consent, a number of boys or men took advantage of the hypersexuality that, as the jury knew, was among her mental problems. We agree with the Appellate Division majority that this is exactly what the diagnosis of hypersexuality would lead one to expect, and that the details of the complainant's sexual experiences were of no more than marginal relevance to this case.

We also agree with the Appellate Division majority that, in all likelihood, proof of these details was prohibited by the Rape Shield Law (CPL 60.42), which bars, subject to certain exceptions, "[e]vidence of a victim's sexual conduct" in sex offense cases. We recognize that this likelihood is not necessarily conclusive on the *Brady* issue. Inadmissible evidence can be

material under *Brady* if it will be useful to the defense, perhaps as a lead to admissible evidence or a "tool in disciplining witnesses during cross-examination" (*United States v Gil*, 297 F3d 93, 104 [2d Cir 2002]). And even the question of admissibility cannot be decided definitively, because defendant has not seen the documents and has had no chance to make an offer of proof that might bring the evidence within an exception to the Rape Shield Law (*see* CPL 60.42 [5] [permitting the trial court to admit evidence that otherwise would be excluded, if it determines after an offer of proof that the evidence is "relevant and admissible in the interests of justice"]). But any evaluation of materiality under *Brady* involves a prediction about the impact of undisclosed material on a trial, and here the existence of a statute that would likely keep out of evidence not only the records themselves but the facts underlying them supports the view of the courts below that their impact, if any, would be slight.

The exception we have mentioned provides the strongest basis for defendant's argument on appeal. Records from 2004, when the complainant was 13, say that she reported having been sexually assaulted by her father. She claimed that he pinned her against a wall and tried to rape her, but she escaped. The records show that her father had in fact been physically abusive, but they also show that the complainant's mother did not believe the charge of sexual assault was true. One record refers to the allegation as "unfounded," without further explanation. These documents give us some pause (*cf. People v Hunter*, 11 NY3d 1 [2008] [finding a *Brady* violation, under a "reasonably probable" materiality standard, where a prosecutor failed to disclose the complainant's report that another man had committed a similar rape]).

But the complainant's 2004 accusation of her father was far removed in time and quite different from the accusation she made in 2009 against defendant. It was an accusation of abuse by a family member, made not in a 911 call immediately after the event, but in the course of treatment by mental health professionals. And even if the accusation was not true, nothing in the records indicates that the complainant fabricated it, rather than misinterpreted or imagined something her father had done. It is, as we have said, almost impossible that a jury could think the complainant's accusation in this case to be an honest but mistaken one, as the accusation against her father may have been.

We therefore hold that the trial court could reasonably think

there was no more than a remote possibility that disclosure of the records it withheld would lead to defendant's acquittal. The court was within its discretion in finding the records' relevance to be outweighed by the complainant's legitimate interest in confidentiality.

Defendant's remaining arguments lack merit.

Accordingly, the order of the Appellate Division should be affirmed.

RIVERA, J. (dissenting). Pretrial disclosure to the defendant of favorable and material evidence is constitutionally required to ensure the defendant's rights of due process and to a fundamentally fair trial (*Brady v Maryland*, 373 US 83, 87 [1963]; US Const, 14th Amend, § 1). Disclosure of exculpatory and impeachment evidence is essential to establishing a defense, and furthers the goals of seeking the truth through the trial process (*see generally Giglio v United States*, 405 US 150 [1972]). Despite the importance of disclosure to the defendant and the proper functioning of our criminal justice system, the majority concludes that denial of vast amounts of revealing medical documents was proper in this case. I disagree.

Here, credibility issues were central to the case, and there was evidence supporting the defendant's version of events, thus requiring the jury to decide between divergent stories. There is a "reasonable possibility" that failure to disclose documents from the complainant's mental health medical records, which reveal her history of memory loss, potential fabrications, substance abuse, distortions in her view of interpersonal relationships, and information suggesting unsubstantiated claims of prior rape and sexual abuse, contributed to the verdict (*see People v Vilardi*, 76 NY2d 67, 77 [1990]). Therefore, the trial court abused its discretion in denying disclosure.

In addition, to the extent the majority suggests that the defendant's challenge to the medical records in this case is limited to a *Brady* violation, I disagree with this narrow interpretation of the defendant's constitutional rights. Denial of documents that would have assisted the defense in preparing for cross-examination of the complainant, including questioning for impeachment purposes, implicates the defendant's confrontation rights.

## I.

Our Federal and State Constitutions guarantee every defendant a fair trial (US Const 5th Amend; NY Const, art I, § 6). Essential to this guarantee, which is grounded in the Due Process

Clause, is the defendant's right to disclosure of evidence "favorable to the accused and material to guilt or punishment" (*Pennsylvania v Ritchie*, 480 US 39, 57 [1987], citing *United States v Agurs*, 427 US 97 [1976]; *Brady*, 373 US at 87). As the majority concedes, evidence confidential in nature is subject to disclosure when the state's interest in maintaining confidentiality is outweighed by a defendant's constitutional rights of access to materially favorable evidence (majority op at 198, citing *People v Gissendanner*, 48 NY2d 543, 548 [1979]). Whether and to what extent confidential information should be disclosed is within the trial court's purview, subject to the proper exercise of its discretionary power (*Gissendanner*, 48 NY2d at 548). Disclosure is required, and the court affords access, "to otherwise confidential data relevant and material to the determination of guilt or innocence, as, for example, . . . when it involves other information which, if known to the trier of fact, could very well affect the outcome of the trial" (*id.*).

In order to determine whether the denial of the documents to the defendant constituted a violation of his constitutional rights under *Brady*, we must decide whether there is a "reasonable possibility that the failure to disclose [the medical reports] contributed to the verdict" (*Vilardi*, 76 NY2d at 77 [internal quotation marks omitted]). In *Vilardi*, we adopted the "reasonable possibility" test recognizing that it was the proper measure of "materiality" (*id.*). Clearly, the test is meant to ensure defendants' access to material available in accordance with *Brady* and our state constitutional guarantees, and sets a high bar against nondisclosure. As we stated, the "reasonable possibility" standard is "essentially a reformulation of the 'seldom if ever excusable' rule" (*id.*; *see Agurs*, 427 US at 106 ["When the prosecutor receives a specific and relevant (discovery) request, the failure to make any response is seldom, if ever, excusable"]).

## II.

No less essential to the defense than the due process rights to disclosure of favorable and material evidence is the defendant's right to confrontation of adverse witnesses, embodied in both our Federal and State Constitutions (US Const 6th, 14th Amends; NY Const, art I, § 6). The majority avoids consideration of the defendant's confrontation rights, instead choosing to analyze the defendant's challenges under *Brady* (majority op at 198). I agree that the defendant's appellate claims are properly the subject of *Brady* analysis, but they also implicate the defendant's confrontation rights.

The defendant argues that he was entitled to access the complainant's mental health records because they were necessary for him to effectively cross-examine the complainant, especially with respect to her reliability, or would have led to discovery of this type of evidence. He contends that the failure to disclose these documents violated his constitutional rights to confront and cross-examine witnesses. His arguments present a viable confrontation rights claim.

Denial of documents that provide the defense with material to prepare for cross-examination and impeachment of the complainant in this case of alleged rape goes to the very core of the right to confront adverse witnesses. Without access to documents concerning reliability of the witness, the defendant cannot properly develop and pursue questioning favorable to the defense or address facts and related issues important to the truth finding process. I would ground this right in our New York State Constitution. We have previously recognized that the protections under our constitution extend beyond those found in our federal counterpart, which sets the floor, but not the ceiling, for the rights of an individual (*People v LaValle*, 3 NY3d 88, 129 [2004]; *accord Sharrock v Dell Buick-Cadillac*, 45 NY2d 152, 159 [1978]).

While our constitutional language mirrors that of the Federal Constitution (*compare* US Const 6th Amend ["(t)he accused shall enjoy the right . . . to be confronted with the witnesses against him"] *with* NY Const, art I, § 6 ["the party accused shall be allowed to . . . be confronted with the witnesses against him or her"]), federal consideration of this issue is uncompelling. In *Pennsylvania v Ritchie*, the plurality rejected a Confrontation Clause challenge to the denial of documents, limiting the application of the Confrontation Clause to a defendant's opportunity to cross-examine:

> "the Confrontation Clause was not violated by the withholding of the [confidential] file; it only would have been impermissible for the judge to have prevented Ritchie's lawyer from cross-examining the [complainant]. Because defense counsel was able to cross-examine all of the trial witnesses fully, we find that the Pennsylvania Supreme Court erred in holding that the failure to disclose the [confidential] file violated the Confrontation Clause" (480 US at 54).

Many states have found the plurality's reasoning unpersuasive, including Pennsylvania, the state whose law was at issue in *Ritchie* (*see Commonwealth v Lloyd*, 523 Pa 427, 432, 567 A2d 1357, 1359 [1989] [defendant's state confrontation clause rights violated where he was denied access to the contents of the complainant's psychiatric records]; *accord Jones v State*, 297 Md 7, 464 A2d 977 [1983] [defendant entitled by common law to inspect grand jury minutes for cross-examination purposes]; *Commonwealth v Stockhammer*, 409 Mass 867, 570 NE2d 992 [1991] [under state confrontation clause defendant can inspect complainant's rape victim counseling records, without in camera inspection, for evidence of prejudice or motive to fabricate by the complainant]; *but see State v Donnelly*, 244 Mont 371, 798 P2d 89 [1990], *revd on other grounds State v Imlay*, 249 Mont 82, 813 P2d 979 [1991] [Montana constitution does not afford greater protection than the Federal Constitution]). Similarly, at least one federal circuit has rejected the narrow confrontation clause analysis in *Ritchie* (*see Wallace v Price*, 2002 WL 31180963, *22, 2002 US Dist LEXIS 19973, *72 [WD Pa, Oct. 1, 2002, civil action No. 99-231], *report and recommendation adopted* 265 F Supp 2d 545 [WD Pa 2003], *affd* 243 Fed Appx 710 [3d Cir 2007] ["plurality's reasoning did not garner a majority of the court" and is therefore not binding]).

In light of the broader guarantees provided under our State Constitution, and because of the important role of cross-examination to ensuring both the rights of the defendant and the truth seeking functions of our criminal justice system, I would reject the narrow interpretation of the *Ritchie* plurality (*see Ritchie*, 480 US at 66 [Brennan, J., dissenting] ["(the plurality's) interpretation ignores the fact that the right of cross-examination also may be significantly infringed by events occurring outside the trial itself, such as the wholesale denial of access to material that would serve as the basis for a significant line of inquiry at trial"]). As we have stated:

> "[I]n determining the scope and effect of the guarantees of fundamental rights of the individual in the Constitution of the State of New York, this court is bound to exercise its independent judgment and is not bound by a decision of the Supreme Court of the United States limiting the scope of similar guarantees in the Constitution of the United States" (*People v Barber*, 289 NY 378, 384 [1943]).

There is no need to address the boundaries of the defendant's confrontation claim in this case, because, as discussed herein,

there is a reasonable possibility that disclosure of the documents would have resulted in a different outcome at trial (*Vilardi*, 76 NY2d at 77). Claims based on the defendant's confrontation rights may require application of a lower threshold to establish violation of those rights, but certainly are not subject to greater scrutiny. Therefore, whether analyzed as a violation of the defendant's confrontation rights, or rights protected under *Brady*, I would find the trial court's denial of the documents constituted an abuse of discretion.

## III.

The trial court and the Appellate Division rejected an absolute prohibition on disclosure, and instead concluded that the defendant was entitled to certain of the complainant's medical records. At the Appellate Division, the majority and dissenting Justices agreed that the state's interest in maintaining the confidentiality of complainant's medical records must cede to the defendant's constitutional rights, and that the defendant was entitled to review at least some of the medical documents (*People v McCray*, 102 AD3d 1000, 1005 [3d Dept 2013]; *see also id.* at 1010-1011 [McCarthy, J., dissenting]). Thus, this case does not involve the propriety of an absolute prohibition on confidential information, but rather the extent of disclosure required to protect defendant's rights while recognizing the state's interest in confidentiality.

As an initial matter, the Appellate Division erred in allowing "an appropriate sample" of the complainant's medical documents to substitute for a fuller disclosure (*McCray*, 102 AD3d at 1005). A sample means an example of something else: "a representative part or single item from a larger whole or group" (Merriam Webster's Collegiate Dictionary 1034 [10th ed 1996]). A sample document, by its nature, shares only general attributes, and not specific peculiarities, with other documents from the "larger whole or group." A single document that discusses a medical condition is thus a "sample" of other documents discussing the same condition.

Here the majority does not specifically reject the Appellate Division's reference to this improper standard, but concludes that many of the undisclosed documents are "cumulative" and therefore not subject to disclosure (*see* majority op at 198-199). However, the undisclosed documents are not merely "cumulative" in a legal sense. Cumulative evidence is "[a]dditional evidence that supports a fact established by existing evidence"

(Black's Law Dictionary 636 [9th ed 2009]). It can be excluded by New York courts when "its admission would prolong the trial to an unreasonable extent without any corresponding advantage"; that is, when it will prove a fact that other evidence has already proven (*People v Davis*, 43 NY2d 17, 27 [1977]; *see also People v Petty*, 7 NY3d 277, 286 [2006]; *People v Corby*, 6 NY3d 231, 235-236 [2005]). Sample documents prove only the general principle that they embody. Assuming that other documents in the "larger whole or group" prove specific facts, those documents are not "cumulative" of the sample document (*cf. People v Russell*, 79 NY2d 1024, 1026 [1992] [four noneyewitness photo identifications not cumulative of eyewitness identifications]; *People v Linton*, 166 AD2d 670, 671 [2d Dept 1990] [the testimony of different social workers was not cumulative when "(e)ach social worker had a different relationship and experience with the victim"]). Cases are made or unmade by specifics, not generalities. Therefore, sample documents that share only general characteristics with a corpus of documents cannot displace the evidentiary value of documents that uniquely prove specific facts.

The risk attendant on selecting a "sample" from the universe of confidential records is that the undisclosed document may contain information about alternative diagnoses or treatment protocols even if the substantive content is representative of other documents containing the same underlying information but with different conclusions. Another risk is that the sample may lack a fuller and more nuanced description of the same information contained in the disclosed sample.

Review of the complainant's disclosed and undisclosed documents illustrates the point. The majority of the documents disclosed to the defendant appear to consist of short, "progress notes" or intake forms, generated by a therapist or other health care practitioner, and do not reflect a full analysis of the complainant's condition. Some contain phrases which suggest significant problems, such as a history of auditory and visual hallucinations, poor impulse control and questionable judgment, but do not adequately reveal the root causes or their impact over time on the complainant. What are missing from the sample, and contained in the undisclosed documents, are narratives based on discussions and professional analysis of the complainant that provide a fuller picture of the complainant's mental health history and conditions and how they may affect her veracity as well as her ability to comprehend and accept

reality. For example, one undisclosed report revealed the complainant has a very poor perception of reality, and noted the complainant's distortions of her interpersonal relationships, leading the health care practitioner to write that the complainant suffers from wishful thinking about relationships with males with whom she is recently acquainted. Similarly, another undisclosed document revealed complainant reported dissociative episodes. The "sample" of disclosed documents did not provide this type of information about the complainant.

Applying the correct standard, the documents could properly be excluded only if there is no reasonable possibility that they contain information that if disclosed would have resulted in a different outcome at trial (majority op at 200-201). I disagree that we can conclude on this record that there is no reasonable possibility that the undisclosed records would have affected the outcome of this case, that is to say that there is no "substantial basis for claiming materiality" (see *Agurs*, 427 US at 106).

Like the majority, I begin my analysis with a review of the information contained in the disclosed documents and compare it to the information in the undisclosed medical records. The complainant's written medical history is extensive and spans years of treatment, primarily describing her mental health services and diagnoses, and includes references to incidents that occurred when the complainant was seven years old.

The trial court disclosed a mere 28 pages, which, with few exceptions, can best be described as brief if not cursory updates of the complainant's condition based on interviews and reviews by a series of health care practitioners, created from different sources, and includes records from episodic hospitalizations and long-term counseling. The majority of these disclosed documents make shorthand references to several of the complainant's mental health and behavioral issues.

The documents state that the complainant is diagnosed as bipolar, and suffered from Tourette's syndrome, post-traumatic stress disorder, attention deficit disorder and epilepsy. They further state that for years she was on several medications, and at times she failed to take her medications as prescribed, including close to the time when she met the defendant. There are documents indicating that she had been hospitalized due to her mental health conditions and suicidal ideation. The documents contain additional references that she suffered from auditory and visual hallucinations; was once found along a local highway

and could not articulate how she got there; she sensed and spoke to dead people; and she had been experiencing "psychotic symptoms."*

The disclosed documents present information about what must be recognized as severe mental health issues and reveal a history of physical and sexual abuse. While the documents disclosed information about the complainant's mental health useful to the defendant, they did not reveal the full range of medical and behavioral issues that implicate the complainant's credibility.

For example, a review of the undisclosed medical records reveals a document that indicates the complainant suffers from memory loss, has difficulty accurately recalling events, has a distorted view of interpersonal relationships and admits to lying. The same undisclosed document also reveals complainant's memory can be selective; she forgets good experiences with people if there are subsequent bad experiences.

Other documents state that complainant's mental health condition will deteriorate as she grows older. I, therefore, disagree with the majority's conclusion that most of the undisclosed documents are merely more of the same, that they lack information distinct from that contained in the disclosed documents, and that the information, if known to the jury, would not have a "reasonable possibility" of resulting in acquittal.

The majority states that medical records referencing the complainant's history of deliberate untruthfulness, as well as her inability to recall events, would have made no difference to the jury because the complainant's failure to recollect or her likelihood to misunderstand events could not have affected her ability to recall the alleged rape, and that the other evidence and the defendant's own testimony supported the complainant's claims that they had a "violent encounter" (majority op at 199). According to the majority, the jury was left to decide who was lying and nothing in the undisclosed documents, with one exception, suggests that she makes false accusations. Yet, the undisclosed medical records contain several references to the complainant's inability to correctly recall events. While disclosed documents and the complainant's own testimony reveal her

---

* In addition to these documents, shortly before trial the defendant learned through a *Brady* disclosure that the complainant had started to abuse drugs and alcohol heavily after the alleged incident and was hospitalized for a suicide attempt.

history of seizures, several undisclosed documents associate her seizure activity with an inability to recollect what had happened to her. Additionally, one undisclosed document discusses the complainant's desire to obtain her mother's trust, implying complainant was not forthcoming with her mother and may have a need to lie so as to avoid disappointing her mother. Another indicates complainant fantasizes about her interpersonal relationships and has a poor perception of reality. The records that indicate an inability to remember and potential history of fabrication would have been critical to the defendant's preparation and cross-examination of the complainant.

It certainly was reasonably possible for the jury to conclude, based on the complainant's prior history of distorted reality, that while she could accurately remember everything leading up to the moment of having sex with the defendant, she fabricated events surrounding the sex act. Indeed, we have long recognized that juries are tasked with making decisions about the credibility or incredibility of testimony, and may accept or discount testimony based on difficult credibility determinations (*see generally People v Sage*, 23 NY3d 16 [2014] [jury is left free to accept or reject testimony]).

The records of possible fabrication of sexual assault and attempted rape by her father and the other undisclosed records could have provided a basis to show falsity of the allegations, or a pattern of false complaints that may very well have been admissible (*see People v Mandel*, 48 NY2d 952, 953 [1979]). Certainly, the records were not inadmissible as a matter of law (*see People v Hunter*, 11 NY3d 1, 6 [2008]), and were within the court's discretion as to whether to admit in the interests of justice (*see* CPL 60.42 [5]). Regardless of the admissibility of these documents, the defendant had a right to review them and determine whether the allegations were unsubstantiated, and showed conduct sufficiently similar to the complainant's alleged claims about the defendant such that defendant could argue they constituted the type of "pattern of false complaints" that would be admissible at trial. Moreover, the documents that were disclosed may have misled the defendant as to the complainant's history of sexual abuse because they referred to physical and not sexual abuse by the father and brother.

The majority concludes that the allegations of attempted rape by the father may not be sufficiently similar to the facts in this alleged "date rape" case, or occurred too distant in time, to support its admission. In fact, undisclosed records indicate the

alleged attempted rape by complainant's father is similar to the allegations made here against defendant in that complainant claims she was forced up against a wall by her father, a much older man, but could not recall how she got away. Here, complainant testified similarly that defendant was "backing [her] up against a wall" and she aggressively tried to fight his advances.

Moreover, the mental health records contain references to the mother's denial of the attempted rape, and thus place its truth in question. Therefore, the defendant should have had the opportunity to review the records and determine whether there was a basis to seek its admission at trial, to show a pattern of false claims of rape.

The records relating to flashbacks from previous alleged sexual abuse also should have been made available to the defendant because they would have allowed the defendant to determine whether complainant's capacity and motive in this case were affected by a prior experience. Therefore, I cannot conclude, as does the majority, that "the trial court could reasonably think there was no more than a [mere] remote possibility that disclosure of the records . . . would lead to defendant's acquittal" (majority op at 200-201).

## IV.

The case as presented to the jury depended on whether the complainant and the defendant engaged in *consensual* sex. Mental health records indicating that complainant has a history of lying or that her memory was unclear go to the truthfulness of her statements that she was raped by defendant. Far from a "hope that the unearthing of some unspecified information would enable him to impeach the witness" (*Gissendanner*, 48 NY2d at 549, citing *People v Norman*, 76 Misc 2d 644 [Sup Ct, NY County 1973]), this information went to whether there could be a basis to disbelieve the complainant's version.

Moreover, the prosecutor argued that defendant knew the complainant had mental health problems simply by observing and speaking with her and that he sought to manipulate her based on what he perceived was her vulnerability due to her mental condition. As the record establishes, the prosecutor argued that the complainant's mental health condition was obvious to the defendant and the jury, and that the defendant took advantage of the complainant. Defense counsel sought to persuade the jury that as a result of the complainant's various

mental health issues, she was either unable to remember that the sex was consensual or was lying about the rape. However, in response to the prosecution's strategy of characterizing the defendant as a manipulative, older man seeking to take advantage of a younger woman who acted in a sexually provocative manner, and who he could see suffered from some type of mental impairment, the defendant had to persuade the jury that the complainant's mental health conditions would have led her to fabricate a story of a rape, or to cause her to believe and recount for the jury an incorrect version of the sexual encounter with the defendant. In that sense, the more the defendant sought to establish the general severity of the complainant's mental health conditions, the more the jury could find persuasive the People's version. Thus, in order for the defendant to present the complainant's mental health condition objectively from the defense point of view—that she is too mentally ill to recall that she consented, or that she made up the whole story because of her illness—disclosure of records about her ability to recall events accurately and her capacity to fabricate events was crucial.

## V.

Medical records describing the complainant's short term memory loss, selective memory, tendency to fabricate, poor perception and unrealistic assessments of intimate relationships, flashbacks of alleged sexual abuse, and possible false allegations of rape went directly to the reliability of the complainant, and would have allowed the defense to fully cross-examine her. The information contained in these documents does not merely give occasion for "some pause" (*see* majority op at 200), but rather establishes that there is a "reasonable possibility" that this information if disclosed would have affected the outcome.

The record reveals that the evidence was such that, as the Appellate Division concluded, "it would not have been unreasonable for the jury to believe defendant's testimony that the sexual encounter was consensual" (*McCray*, 102 AD3d at 1003 [footnote omitted]). The denial of additional medical records providing evidence that could serve as a basis for the jury to disbelieve the complainant's version was, therefore, an abuse of discretion.

I dissent.

Judges GRAFFEO, READ and ABDUS-SALAAM concur with Judge SMITH; Judge RIVERA dissents and votes to reverse in an opinion in which Chief Judge LIPPMAN and Judge PIGOTT concur.

Order affirmed.