OPINION OF THE COURT
Cooke, J.
On the morning of September 25, 1974, police officers arrived at an apartment in the City of Mount Vernon and encountered a horrifying scene. Two elderly women, their corpses riddled with stab wounds, lay dead on the bedroom floor. Robbery appeared to have been the underlying motive. The apartment itself was in complete disarray, with papers, clothing and women’s hand bags scattered about, blood splattered on the walls and floor and prints from bloodied men’s sneakers in the bedroom and bathroom. A preliminary investigation unveiled the defendant and his common-law wife Ziriphia Mayhew, the niece of one of the victims, as suspects in the crime.
As the inquiry proceeded, it became apparent that defendant and Mayhew were indeed involved in the events of the prior evening. In return for a grant of immunity, Mayhew implicated defendant to such an extent that he was soon indicted and tried for two counts of intentional murder (Penal Law, § 125.25, subd 1), two counts of felony murder (Penal Law, § 125.25, subd 3), one count of attempted robbery in the first degree (Penal Law, § 160.15, subd 1) and four counts of criminal possession of a weapon in the fourth degree (Penal Law, § 265.01, subd [2]).
At trial, the most damaging incriminating evidence was supplied by Mayhew’s testimony. It had previously been established that on prior occasions the two had discussed the means whereby they could separate Mayhew’s aunt from her money. Indeed, on one occasion defendant had stated in the presence of Mayhew and a third person that they would "have to hurt her to get it.” On the night of September 24, 1974, defendant put his plan into action.
According to Mayhew, after stating that she was going to retrieve some personal items at her aunt’s apartment, defendant asked to accompany her so that he could "get some scratch money.” On the way to their destination, defendant stopped off at a friend’s apartment and borrowed a hammer. *78 Upon arriving at the victim’s apartment, the couple was surprised to see that Mayhew’s aunt had guests. They stayed only a few minutes, during which time defendant surreptitiously entered the bedroom and searched for cash. His quest proved unsuccessful, however, and the couple journeyed elsewhere, waiting for the guests to depart.
Later that evening, Mayhew and defendant returned to her aunt’s apartment and noticed that the visitors’ car was no longer in sight. Defendant told Mayhew that he intended to "rip off” her aunt and kill the two elderly women. When Mayhew sat in silence, defendant punched her in the chest and she agreed to accompany him into the apartment. May-hew testified that she watched terror stricken as defendant savagely murdered the two women, first striking them with the hammer and later repeatedly stabbing them, after his efforts to extract money proved unsuccessful. The couple then drove home, where defendant laundered his bloodstained clothes and sneakers, after first disposing of the murder weapons in a nearby sewer.
As might be expected, defendant’s version of the events of that night tended to significantly downplay his role in the crimes. Testifying on his own behalf, defendant claimed that he had waited in the car while Mayhew went to the apartment to ask her aunt for money. After waiting over one-half hour for her return, defendant went upstairs and knocked on the apartment door. Some time later, the door opened and defendant encountered Mayhew in a state of shock, the bloodied bodies of the two women lying on the bedroom floor. Upon seeing the bodies, defendant testified, he asked Mayhew what had happened and received a response that there had been an altercation. Mayhew prevented him from summoning assistance and disposed of the weapons on their way home.
As the testimony unfolded, it became apparent that under either version of the relevant testimony, Mayhew was no mere witness to the crime. Under any view of the evidence, May-hew participated in the events of that night to such an extent that she could have been prosecuted for the underlying offenses but for her grant of immunity. She was, at the very least, an accomplice to the crimes for which defendant was charged (CPL 60.22, subd 2; see People v Dlugash, 41 NY2d 725, 731; People v Beaudet, 32 NY2d 371, 376). Being such, her testimony took on a special significance.
The law looks upon accomplice testimony with a suspi *79 cions eye. Especially when traded for immunity from prosecution, such evidence must be scrutinized with the utmost caution and circumspection because, while such testimony is certainly competent, it lacks the inherent reliability attached to the testimony of a disinterested witness. To compensate for its untrustworthy nature and to insure the rights of the defendant, accomplice testimony, standing alone, is insufficient to sustain a criminal conviction (People v Kress, 284 NY 452, 460). Thus, where the undisputed evidence establishes a witness as an accomplice, the jury must be so instructed and charged that the witness’ testimony must be corroborated by independent evidence materially connecting defendant with the commission of the crime (People v Basch, 36 NY2d 154, 159; People v Ohlstein, 54 AD2d 109, affd 44 NY2d 896; CPL 60.22, subd 1).
While the jury did receive proper instructions with respect to the nature and corroboration requirements of Mayhew’s accomplice testimony, the court neglected to give instructions with respect to the nature of accessorial liability (Penal Law, § 20.00). The jury at this point was understandably confused and requested supplemental instructions as to "the element of guilt between partners in crime.” Counsel for defendant, while raising no objection to giving these supplemental instructions, did request, for the first time, that they be given in conjunction with a charge of criminal facilitation in both the first and second degrees (Penal Law, §§ 115.00, 115.05). The court, however, only instructed the jury with respect to the implications of accessorial liability.
We find no error in either the supplemental charge or the refusal to charge criminal facilitation upon defendant’s belated request. At any time the jury, during its deliberations, requests additional instructions concerning the law or the evidence, it is incumbent upon the court to give such instructions (People v Jackson, 20 NY2d 440, 454, cert den 391 US 928; People v Miller, 6 NY2d 152, 156). Of course, this does not mean that the court must respond to all jury inquiries at the expense of creating reversible error. It is reversible error, for example, to submit to the jury a theory of liability not supported by the evidence adduced at trial or contained in the indictment (CPL 200.70; People v Rosenberg, 293 NY 16, 17). But for present purposes whether the defendant was the actual perpetrator of the crime or liable as an accessory thereto is irrelevant. There is no distinction between liability *80 as a principal and criminal culpability as an accessory and the status for which the defendant is convicted has no bearing upon the theory of the prosecution (People v Katz, 209 NY 311, 325-326; People v Corbalis, 178 NY 516, 523 [concurring opn]; People v Henry, 18 AD2d 293). Since the jury was already charged that Mayhew was an accomplice as a matter of law, the court’s amplification of the charge with respect to the scope of accessorial liability was entirely proper. And, even more fundamental,, inasmuch as there was no exception to the supplemental instructions there has been no issue of law preserved for our review (People v Patterson, 39 NY2d 288, 294-295, affd 432 US 197; People v Lang, 36 NY2d 366, 371; People v Rainey, 27 NY2d 748, 749).
The assignment of error to the refusal of the court to charge criminal facilitation merits little discussion. We need not decide whether under these circumstances a charge of facilitation would have been proper as a lesser included offense for there was no timely request to so charge. So that opposing counsel may have the opportunity to address all offenses that the court will submit to the jury, all requests to submit lesser included offenses, as a general rule, should be made prior to submission to the jury (see CPL 300.50, subd 2; 470.05). By failing to make the request until after the jury had commenced its deliberations, defendant waived whatever right he may have had to have facilitation submitted as a lesser included offense (CPL 470.05, subd 2; People v Williams, 31 NY2d 151, 153).
Defendant also contends that the court erred in refusing to permit the jury to hear testimony concerning what are claimed to be prior statements by Mayhew inconsistent with her testimony at trial. As a general rule, the credibility of any witness can be attacked by showing an inconsistency between his testimony at trial and what he has said on previous occasions (Richardson, Evidence [10th ed-Prince], § 501). However, as this testimony is often collateral to the ultimate issue before the jury and bears only upon the credibility of the witness, its admissibility is entrusted to the sound discretion of the Trial Judge whose rulings are not subject to review unless there has been an abuse of discretion as a matter of law (People v Sorge, 301 NY 198, 202). Further, it is necessary that the witness be clearly and fairly apprised of the statements which may be subject to impeachment (Loughlin v Brassil, 187 NY 128, 134). Thus, there must be a proper *81 foundation laid for the introduction of prior inconsistent statements of a witness. In order to prevent surprise and give the witness the first opportunity to explain any apparent inconsistency between his testimony at trial and his previous statements, he must first be questioned as to the time, place and substance of the prior statement (People v Weldon, 111 NY 569, 575-576; Richardson, Evidence [10th ed-Prince], § 502).
Applying these principles to the facts at bar, we find that the testimony of both witnesses was properly excluded. The first, a correction officer at the jail in which Mayhew was incarcerated as a material witness, was uncertain of the tenor and substance of the statement she attributed to Mayhew. The trial court ruled that the proffered testimony was irrelevant. As the witness could not testify to the statement with any degree of precision or specificity, its probative value was negligible and was properly excluded.
The testimony of the second witness, Joseph Allen, the estranged husband of Mayhew, was likewise correctly rejected as a proper foundation for its introduction had not been laid. Allen was prepared to testify that one year prior to the murders, Mayhew had told him that she wanted to get some money from her aunt and would kill her if necessary. On cross-examination, Mayhew had denied that she told Allen she wanted money from her aunt but was never asked whether she threatened to kill her, the critical inquiry in the entire line of questioning. While it was error to exclude the former statement, such error was indeed harmless since there had been no foundation laid which would permit the introduction into evidence of the latter and more crucial statement as to the threat to slay the aunt.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order affirmed.