People v Hoffman (2025 NY Slip Op 07247)

People v Hoffman

2025 NY Slip Op 07247

Decided on December 24, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 24, 2025

CR-23-0968
[*1]The People of the State of New York, Respondent,
v
Christopher D. Hoffman, Appellant.

Calendar Date:October 17, 2025

Before:Clark, J.P., Pritzker, Lynch, Powers and Mackey, JJ.

Hancock Estabrook, LLP, Syracuse (Alan J. Pierce of counsel), for appellant.
Joseph G. Fazzary, District Attorney, Watkins Glen (Jeremy J. Hourihan of counsel), for respondent.

Pritzker, J.
Appeal from a judgment of the County Court of Schuyler County (Matthew Hayden, J.), rendered December 15, 2022, upon a verdict convicting defendant of the crimes of criminal sexual act in the in the second degree and endangering the welfare of a child.
In July 2021, defendant was charged by indictment with the crimes of rape in the second degree, criminal sexual act in the second degree and endangering the welfare of a child stemming from criminal sexual conduct against the victim in March 2021, when the victim was less than 15 years old and defendant was over the age of 18. After trial, a jury found defendant not guilty of rape in the second degree and guilty of the remaining two counts. County Court thereafter sentenced defendant to a prison term of six years, to be followed by eight years of postrelease supervision, on count 2, and a concurrent one-year term of incarceration on count 3. Defendant appeals.

Defendant contends, without elaboration, that based on the evidence presented at trial, the jury's verdict is against the weight of the evidence. As relevant here, "[a] person is guilty of criminal sexual act in the second degree when . . . being [18] years old or more, he or she engages in . . . anal sexual conduct with another person less than [15] years old" (Penal Law former § 130.45 [1]). " 'Anal sexual conduct' means conduct between persons consisting of contact between the penis and anus" (Penal Law § 130.00 [former (2) (b)]).[FN1] Additionally, "[a] person is guilty of endangering the welfare of a child when . . . [h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than [17] years old" (Penal Law § 260.10 [1]).
The victim testified that she first met defendant when she was eight years old and that, at the time of the incident, the victim lived with her mother (hereinafter the mother), three sisters and defendant. The victim testified that one or two days before the the incident occurred, the power went out in the victim's home and she went to help defendant check the breaker box by holding a flashlight. During this time, the victim recalled that defendant asked her if she was wearing any clothing under her sweatshirt, to which she answered in the negative. At this point, the victim stated that defendant lifted up her sweatshirt slightly and asked, "what if a guy comes up to you and goes like this[?]" The victim recalled that defendant did this multiple times and, although he did not expose her breasts or touch her, it made the victim uncomfortable. She assumed that defendant was just trying to warn her about boys. After this occurred, the victim messaged her boyfriend and stated that defendant sexually assaulted her. The victim explained that she used those words because her best friend considered it to be sexual assault.
The victim testified that on the day of the incident, the mother went to the hospital due to complications with a prior surgery, leaving her, defendant [*2]and her sisters at home. After the victim and defendant brought one of the victim's sisters to defendant's mother's home, as part of the victim's nighttime routine, she went into defendant's room with another sister to say goodnight and roughhouse for a bit before going to bed. This night, the victim was wearing a T-shirt, leggings, bra and underwear. The victim recalled that, as she typically does, she was wrestling with her sister and defendant, who was, as was typical, wearing only his underwear. The victim testified that, unlike normal nights, defendant grabbed only her during the horseplay, not her sister. After the horseplay ended, the victim stated that the three sat in defendant's bed and watched television until the victim's sister left to go to bed.
After the victim's sister left the room, the victim moved next to defendant and he began to rub her back, first over her shirt and then under her shirt. The victim then testified that defendant attempted to unhook her bra, but could not because of a broken clasp. Defendant asked the victim if she wanted him to fix it, at which point the victim replied yes, and defendant told her to take the bra off, which she did. Defendant then continued to rub the victim's back and moved his hand to the victim's abdomen and breasts and vagina, causing her to freeze. The victim recalled that defendant asked her to touch him, but she was "[un]able to get words out." The victim then testified that defendant took her legs and dragged her to the side of the bed and then took off her leggings and underwear. The victim recalled that defendant took his underwear off and put his penis "inside of [her]." When asked to clarify on direct, the victim explained that it felt as though his penis was in her vagina, but she had since been told that DNA was not found in her vagina, rather it was found in her butt. When reminded to testify as to her memory, she stated that she "[felt] it in [her] vagina." The victim recalled that defendant repeatedly inserted and removed his penis, and that during this time, defendant's penis also came into contact with her anus. After defendant stopped, she believed that he ejaculated into a washcloth. The victim then left defendant's room.
Upon returning to her bedroom, the victim immediately contacted the boyfriend and told him that defendant raped her. The boyfriend told his mother, who ultimately called the police. The police then came to the victim's house and, after a police officer spoke to her, she was transported to a hospital for a sexual assault examination. Prior to leaving, the victim left a note for her sister stating that she was running away, which had always been her plan. At the hospital, the victim recalled that her mother accused her of lying, which made her feel bad. During this examination, the victim recalled that she was still attempting to process what happened. The victim denied making up this story to get out of the house and stated that while there were times that [*3]she did get along with defendant, she did not like him. During a lengthy and thorough cross-examination, the victim acknowledged that she previously told her mother that she wanted defendant out of the house on multiple occasions. She also acknowledged that, in the days leading up to the incident, she was having trouble in school and was caught with vapes, which she did not want defendant to find out about. The victim also admitted that, during a forensic interview after the incident, when she used the term "private parts," she was referring to breasts and the vagina. Defense counsel showed the victim a diagram utilized during the forensic interview and confirmed that the victim was asked by the interviewer to circle where the victim "said [she was] sexually assaulted"; she circled the lips, breasts and vagina but not the anus.
The doctor who examined the victim after she was taken to the hospital testified regarding her examination of the victim the night of the incident. Her examination revealed that the victim did not have any signs of bruising, tearing, bleeding or other forms of overt trauma. The doctor testified that most of her sexual assault examinations are normal and "don't have signs of overt trauma." Further, the doctor explained that she obtained the swabs sent to the state crime lab for further testing and that, based upon the victim's allegations of the incident having occurred hours before, the examination kit and swabs were taken at an ideal time to collect evidence. Craig Bianco, an investigator, testified that on the day of the incident, he received a call from a department sergeant that the victim was potentially sexually assaulted. Bianco responded to defendant and the victim's house and defendant answered the door. Bianco then spoke to the victim, who stated that defendant sexually assaulted her, prompting him to collect the victim's clothing as evidence. Bianco then interviewed defendant at the sheriff's office and recalled that when he shared the allegations with defendant, defendant remained calm and indifferent. Bianco then read a statement memorializing his interview with defendant in which defendant denied touching the victim's breasts or vagina and denied having sexual intercourse with her. When asked whether he wanted to add anything, defendant stated that he had masturbated in his bathroom earlier that evening. Also, defendant agreed to provide a DNA sample.
As for the DNA sample and swabs obtained during the victim's sexual assault examination, a forensic scientist from the State Police lab testified regarding his processing of the victim's sexual offense evidence collection kit and that sperm was not found on the perianal, anal, vulvar, vaginal or cervical swabs. Margaret Raydo, another forensic scientist at the State Police lab, testified that she performed the DNA testing on the swabs obtained from the victim and defendant, specifically looking for male DNA. Raydo explained that while male DNA was detected in [*4]the swabs from the victim's breasts, vulvar, vaginal, cervical, perianal and anal swabs, consistent with the lab's procedure, she elected to proceed with further testing of only the perianal and anal swabs. Those two swabs were chosen because there was "sufficient male DNA . . . [a]nd the female-to-male ratio was a little bit lower . . . and [she would] be able to detect the male component." Raydo testified that the mixture profile from the perianal swabs was consistent with DNA from at least two donors, at least one of which was male, and that the major contributor was the victim. However, the sample was not suitable for comparison against a DNA sample provided by defendant. The mixture profile from the anal swabs was also consistent with DNA from two donors, one of which was male; the major contributor matched the victim's DNA and defendant could also be included as a contributor. Specifically, Raydo testified that the mixture profile from the anal swabs was "135 sextillion times more likely to be observed if the donors [were the victim] and [defendant] rather than if the donors [were the victim] and a randomly-selected unrelated individual."
On cross-examination, Raydo clarified that the sample obtained from the perianal swab was consistent with at least two donors, at least one of which is male, but there could be more donors. She also explained that the program the lab utilizes automatically states that the mixture profile from the anal swabs was from "at least" two donors; however, Raydo's actual analysis of the anal swabs confirmed that there were exactly two donors. Raydo also testified that it is possible that DNA can transfer through contact and skin cells and also acknowledged that one reference sample from defendant appeared contaminated during testing, so this sample was not used for any comparison and the contamination did not negatively impact the case. Bianco testified that after he received the lab results, he confronted defendant with them. Bianco read a statement memorializing this second interview with defendant, in which defendant stated he wanted to change a few things about his version of events the night of the incident. To that end, he added that while the victim was in his bed, he "woke up with a hard-on." When asked how defendant explained his DNA being inside of the victim's anus, he responded that he "[has] been told that [he] roll[s] over and grind[s] on [the mother]," and he agreed that he was saying that he might have rolled over and grinded on the victim.
For the defense, Gary Skuse, an expert witness, testified regarding the DNA testing performed by Raydo and explained that it is possible to know if more than one individual's DNA is present but because of potential overlapping in DNA traits, it is not possible to know if it is two individuals or more. Regarding Raydo's results that the anal swab contained DNA from two individuals, as opposed to at least two, Skuse testified that this use of language was due to [*5]laboratory protocols and a use of judgment indicating that they believed it was only two individuals, as opposed to an objective measuring of exactly two individuals' DNA. Regarding DNA transfer, Skuse testified that DNA can be transferred from one person to an object or another through physical contact and the shedding of skin cells, the extent of which varies due to a multitude of factors. Skuse testified that the general cleanliness of a home will impact the extent of skin cell transfer occurring in the home. Skuse also testified that actions such as wrestling could cause the transfer of DNA between individuals, including from bedding to individuals, from individual to individual and from an individual to clothing to another individual. Skuse also acknowledged that sexual intercourse will result in the transfer of skin cells and DNA.
Defendant's mother testified that she has known the victim for 12 years, and that on numerous occasions she has been with the victim's extended family when family members have been talking about the victim. Based on these conversations, which took place before the alleged incident, defendant's mother testified that within her extended family, the victim does not have a good reputation for truthfulness. Defendant's mother also recognized that teenagers typically have issues telling the truth and admitted that she did not want the allegations against defendant to be true. Next, the mother testified to the condition of the home around the time of the incident, specifically that it was very messy, particularly with piled-up clothes. The mother also testified that leading up to the day of the incident, the victim got in trouble for having cigarettes at school and that it was decided that, as a punishment, the victim's guinea pigs would be given away, causing the victim to become angry. The mother testified that in the relevant communities of her extended family and the victim's school, the victim had a bad reputation for truthfulness. The mother also testified that, on the day of the incident, she went to the emergency room due to complications with a prior procedure and had to stay overnight. While in the hospital, the mother received calls from both defendant and the victim and came to discover the victim's allegations. The mother also spoke to the detective interviewing the victim and told him that she did not believe the victim. Upon seeing the victim in the hospital, the mother confirmed that she did not ask the victim if she was okay, nor did she hug her.
Defendant testified at trial that he did not rape the victim and that his penis never came into contact with her. Defendant testified that the day prior to the alleged incident, the victim got in trouble for having vapes and was punished by having to get rid of her guinea pigs. On the night of the alleged incident, defendant testified that he and the victim brought supplies for another child to defendant's mother's home in preparation for defendant's mother to [*6]watch that child overnight and the next day. Then, defendant, the victim and two other children watched television in defendant's bed before one child left for bed, at which time the victim and the other child began to wrestle together and with defendant. At this time, defendant was wearing only underwear but remained under his blanket. Defendant and the children then called the mother in the hospital before lying down in defendant's bed, at which time the victim asked defendant to rub her back. While defendant rubbed the victim's back, he testified that she tried to take her bra off and informed defendant that the clasp was broken. The victim then took her bra off so defendant could fix it in the morning and defendant went to sleep. The next thing defendant recalled was being awoken by Bianco at his door. Defendant testified that he was truthful in his denial of the allegations against him. Defendant confirmed that he told Bianco that he masturbated in his bathroom the evening of the incident. Defendant also testified to informing investigating officers that he wanted to change his story of events, and that, to explain how his DNA got inside of the victim, he thought of what could have possibly happened. He testified that one explanation he came up with to give to Bianco was that he may have grinded on the victim. Defendant clarified that he was not asked by Bianco if he actually had grinded on the victim, and, in his testimony, denied having ever done so.
Given the foregoing, a different verdict would not have been unreasonable had the jury believed defendant's testimony and credited his theory of his DNA having transferred onto the victim by innocent means (see People v Paige, 211 AD3d 1333, 1336 [3d Dept 2022], lv denied 39 NY3d 1143 [2023]). However, the victim's version of events was corroborated by the DNA evidence and testimony, and her credibility as well as any perceived prior inconsistent statements were fully explored at trial (see People v Sharlow, 217 AD3d 1120, 1122 [3d Dept 2023], lv denied 40 NY3d 1013 [2023]). Contrary to defendant's assertion, the verdict as to the count of criminal sexual act in the second degree is not against the weight of the evidence as the victim testified that defendant's penis contacted "everywhere down near [her] vagina and [her] butt and everything," which was corroborated by the DNA match on the swab from the victim's anus. Thus, inasmuch as "all that is required is contact . . . , [not] intercourse or penetration" (People v Green, 208 AD3d 1539, 1542 [3d Dept 2022]; see Penal Law § 130.00 [former (2) (b)]), when viewing the evidence in a neutral light and providing deference to the jury's credibility determinations, we find that the verdict is supported by the weight of the evidence (see People v Mayette, 233 AD3d 1097, 1101 [3d Dept 2024], lv denied 43 NY3d 945 [2025]; People v Johnson, 225 AD3d 927, 930-931 [3d Dept 2024], lv denied 42 NY3d 927 [2024]).
Defendant asserts that he was deprived of [*7]his right to a fair trial based upon multiple evidentiary errors. "Trial courts are accorded wide discretion in making evidentiary rulings and, absent an abuse of discretion, those rulings should not be disturbed on appeal. However, a court's discretion in evidentiary rulings is circumscribed by the rules of evidence and the defendant's constitutional right to present a defense" (People v Gaylord, 194 AD3d 1189, 1191 [3d Dept 2021] [internal quotation marks, brackets and citations omitted], lv denied 37 NY3d 972 [2021]). "While relevant evidence is generally admissible unless it violates an exclusionary rule, [it] may still be excluded by the trial court in the exercise of its discretion if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury. However, evidence is only relevant if it tends to prove the existence or non-existence of a material fact, i.e., a fact directly at issue in the case, and evidence of merely slight, remote or conjectural significance will ordinarily be insufficiently probative to outweigh the countervailing risks of prejudice" (People v Heiserman, 127 AD3d 1422, 1423 [3d Dept 2015] [internal quotation marks, ellipsis, brackets and citations omitted]).
First, defendant alleges that County Court erred in not allowing testimony regarding the victim's viewing of pornography and the use of the mother's vibrator because testimony regarding same would establish the victim's anatomical awareness of her own body as well as bear on her credibility. While, on appeal, defendant focuses his argument on whether this evidence is precluded by the Rape Shield Law (see CPL 60.42), the court did not preclude the evidence on this basis, but rather found that it was not relevant. As to the victim's alleged viewing of pornography, in his offer of proof, defendant alleged that potential witnesses had observed the victim's search history in her cell phone and that, according to said history, she had accessed pornography both before and after the incident. Defendant then argued that, because she had accessed pornography and watched it, she would be "intimately aware of her female anatomical structure." In its decision, the court detailed how defendant's offer of proof was linked to a number of assumptions; that the victim was the only person with access to her phone during the relevant time, that the search for pornography meant that the victim actually viewed the pornography and that, because she had viewed pornography, she would have had heightened knowledge as to what specifically was occurring during the sexual abuse. Based upon these many assumptions, as well as the "tenuous and illogical" connection between the victim's viewing of pornography and her credibility that the sexual abuse occurred, the court found that the proffered evidence was irrelevant. The court did hold, however, that defendant could cross-examine the victim as to why she used non-anatomical terminology [*8]when describing the sexual act forming the basis of her allegations, just without the reference to pornography.
Similarly, as to testimony regarding the vibrator, County Court cited to the many assumptions defendant's offer of proof made to establish the relevancy of the victim having possibly used the mother's vibrator and the relevancy to her anatomical awareness. The court also specifically addressed defendant's alternate offer of proof, that the vibrator may have been a source for transfer of defendant's DNA to the victim. Considering whether preclusion of evidence related to the vibrator would deprive defendant of his opportunity to present a complete defense, the court granted defendant "limited leeway to question [the victim] regarding her possession and use of the vibrator in immediate temporal proximity to the alleged sexual assault," but disallowed collateral impeachment on the subject.[FN2] We perceive no abuse of discretion in either of these rulings, and note the careful balancing of not only the probative and prejudicial value but also defendant's rights in reaching said determinations (see People v Restifo, 220 AD3d 1113, 1119 [3d Dept 2023], lv denied 40 NY3d 1094 [2024]; People v Pendell, 164 AD3d 1063, 1070-1071 [3d Dept 2018], affd 33 NY3d 972 [2019]).
Nor are we persuaded by defendant's contention that County Court abused its discretion in precluding three of defendant's five potential character witnesses from testifying as a sanction for repeated discovery violations and due to the repetitive nature of their testimony (see CPL 245.20; People v Every, 146 AD3d 1157, 1163 [3d Dept 2017], affd 29 NY3d 1103 [2017]; compare People v O'Brien, 140 AD3d 1325, 1327-1328 [3d Dept 2016]). Mindful of defendant's right to mount his defense, County Court balanced this important interest against the discovery violation denying the People the opportunity to prepare for cross-examination, and ruled in a fashion that permitted one character witness from each "cohort" of the victim's family to testify. Additionally, the court allowed the mother to testify about the victim's reputation for truthfulness within her school community. In other words, this is not a situation where County Court's evidentiary ruling "deprived the jury from undertaking a meaningful assessment of [the victim's] credibility" such that the preclusion of the three additional character witness could be considered reversible error (People v Fernandez, 17 NY3d 70, 78 [2011]). To the contrary, the victim's credibility and reputation for truthfulness were extensively explored throughout the trial.
Similarly, we discern no error in County Court limiting defendant's expert witness to testifying generally regarding DNA transfer as opposed to testifying regarding specifics as a sanction for defendant's discovery violations (see CPL 245.10, 245.20 [1] [f]; [4] [a]).[FN3] Therefore, inasmuch as defendant submitted the proposed testimony by the expert regarding sperm in pre-ejaculate fluid [*9]on the eve of trial, County Court did not abuse its discretion by precluding such specific testimony while allowing other general testimony and commentary on the People's DNA report (see generally People v LeFebvre, 45 AD3d 1175, 1175-1176 [3d Dept 2007]). Nor do we find that the court's limit of the expert's testimony regarding specific methods of DNA transfer through laundry was an abuse of discretion as there were no facts in evidence supporting the conclusion that defendant contacted any of the piled laundry such that his DNA could have then been transferred to the victim (see People v Bethea, 261 AD2d 629, 630-631 [2d Dept 1999], lv denied 93 NY2d 1014 [1999]).
Defendant also challenges County Court's rulings as to hearsay objections, claiming that the allegedly erroneous rulings were "[i]nconsistent, [b]iased, [a]nd [u]nfair." In support of this argument, defendant cites to two hearsay statements offered by the People, to which defense objections on the basis of hearsay were overruled, and contrasts these with six hearsay statements offered by defendant, to which the People's objections on the basis of hearsay were sustained. Defendant does not make specific legal arguments as to why any of these rulings were erroneous, but rather summarily concludes they were and that this inconsistency "demonstrated an unfair bias in favor of the prosecution and against [d]efendant." Having carefully reviewed the challenged hearsay statements, we discern no errors in the court's rulings nor do we find them to be inconsistent, thus lending no support to defendant's unpreserved claim of judicial bias (see People v Swartz, 160 AD3d 1296, 1296 [3d Dept 2018]; People v Holmes, 151 AD3d 1181, 1184 [3d Dept 2017], lv denied 29 NY3d 1128 [2017]). Certainly, "the fact that a judge issues a ruling that is not to a party's liking does not demonstrate either bias or misconduct" (Mokay v Mokay, 124 AD3d 1097, 1099 [3d Dept 2015] [internal quotation marks and citation omitted]).
Despite defendant limiting his arguments on appeal regarding hearsay rulings only to the extent that they were "[i]nconsistent, [b]iased, [a]nd [u]nfair," the dissent analyzes these rulings in the context of a violation of defendant's constitutional right of confrontation. However, as a threshold matter, not only did defendant fail to raise this argument in his brief, but defense counsel did not object at trial on this basis, and therefore did not preserve any arguments relative to the Confrontation Clause (see People v Wakefield, 175 AD3d 158, 170 n 6 [3d Dept 2019], affd 38 NY3d 367 [2022], cert denied ___ US ___, 143 S Ct 451 [2022]; People v Cruz, 210 AD3d 903, 904 [2d Dept 2022], lv denied 39 NY3d 985 [2022]). Nor has defendant asked us to exercise our interest of justice jurisdiction to reverse on this basis. Nevertheless, the dissent, without invoking interest of justice jurisdiction, seeks to reverse defendant's conviction primarily on this ground.
In this vein, though not raised as [*10]an issue in defendant's extremely thorough 100-page brief on appeal, the dissent focuses great attention on an attempt by defense counsel to impeach the victim by way of an allegedly prior inconsistent statement made during her forensic interview at the Child Advocacy Center.[FN4] Unlike the unpreserved Confrontation Clause argument, because defendant did argue that these hearsay statements should come in as prior inconsistent statements, we will address whether County Court made an erroneous evidentiary ruling. When asked specifically on cross-examination whether she stated during the interview that defendant had "contact with [her] butt," she responded that she did not remember. Defense counsel then sought to utilize a transcript of that interview, or play the video of the interview, to refresh the victim's recollection that she never made such a statement at the time.[FN5] The People objected, which County Court sustained as an improper method to refresh the victim's recollection given that it wasn't a specific statement that the victim didn't recall making, but rather that she did not make such a statement.[FN6] While discussing the subject, the court suggested that the way to "avoid all of this" was to use the diagram utilized during the interview where the victim circled the places where defendant touched her, and did not circle the butt. Despite the prosecutor's concern that the victim failing to circle the butt on the diagram was not inconsistent per se with the victim's testimony at trial, the court permitted defense counsel to proceed in this manner, over the prosecutor's repeated objection. Defense counsel then admitted the diagram into evidence while questioning the victim about it, putting before the jury the alleged inconsistency. Given the foregoing, even if we were to determine that County Court erred by not allowing defense counsel to refresh the victim's recollection by playing the interview or reading the transcript, we do not find it to be an abuse of discretion insofar as the court allowed defense counsel to admit the diagram into evidence and question the victim about having not circled the butt, therefore allowing the jury to hear this potential inconsistency (see People v Maxam, 135 AD3d 1160, 1162 [3d Dept 2016], lv denied 27 NY3d 1135 [2016]; People v Johnson, 176 AD2d 269, 270 [2d Dept 1991], revd on other grounds 81 NY2d 828 [1993]).[FN7] Moreover, the victim's credibility was explored by defense counsel at length during the trial as well as discussed during summation.
Defendant also asserts that County Court abused its discretion in its limited disclosure of the victim's confidential medical records after an in camera review. Prior to trial, defendant requested, among other things, all medical or psychiatric records for the victim's visits to medical or mental health facilities and all school records for the victim. Although the People opposed disclosure of the requested records, the court ultimately determined that defendant "articulated [*11]a good faith basis to believe that [the victim's] mental health records [and certain school records] may contain data relevant and material to the determination of guilt or innocence in that they may contain information that has a bearing on [the victim's] credibility." As such, the court granted defendant's request for in camera review of these records. After said review, the court found that disclosure of certain medical and mental health records was warranted, including records that pertained to the victim having had hallucinations as well as a statement that no previous sexual contact occurred with defendant. The court noted that many of the records which referenced the victim's credibility were based on hearsay statements by family members and would not warrant disclosure. Additionally, the court found that none of the school records included material that would warrant disclosure.
After a careful review of the entirety of the records reviewed by County Court in camera, we perceive no error in the court's disclosure of certain health records pertaining to the victim and refusal to disclose others. Of note, the court disclosed portions of the medical and mental health records stating that the victim had both a reputation for untruthfulness among her family as well as specific concerns regarding a history of lying, hypersexual behaviors and nicotine use. The court further disclosed records indicating the victim's history of auditory and visual hallucinations, a prior, potentially inconsistent statement denying such hallucinations and a statement that no previous sexual contact occurred with defendant. Regarding the withheld documents, many of the medical records were duplicative of disclosed material, contain hearsay statements reflecting same or are otherwise irrelevant. Therefore, County Court "provided an appropriate sample of documents that covers all of the victim's relevant and material mental health issues . . . , [and] the records sought by defendant that the court did not disclose were either wholly irrelevant to the determination of defendant's guilt or innocence, or largely cumulative of those records that the court did, in fact, disclose to defendant" (People v Hurst, 204 AD3d 1415, 1416-1417 [4th Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1071 [2022]; see generally People v Dirschberger, 230 AD3d 876, 879 [3d Dept 2024], lv denied 42 NY3d 1079 [2025]). Thus, County Court did not abuse its discretion in limiting its disclosure of the victim's confidential medical records to the parties (see People v Hurst, 204 AD3d at 1416-1417; People v Tirado, 109 AD3d 688, 688-689 [4th Dept 2013], lv denied 22 NY3d 959 [2013], cert denied 574 US 877 [2014]).
Relatedly, we are unpersuaded by defendant's argument that County Court committed reversible error by limiting its review of the victim's subpoenaed psychiatric, medical and school records for evidence supporting his allegation that she had previously made [*12]false allegations of sexual abuse against others. As noted, County Court conducted a thorough in camera review of the records, released some of them to defendant, and found, as it pertained to the statements contained therein regarding the victim's prior allegations of sexual abuse, that the records did not sufficiently establish the falsity of the prior complaints or that the "circumstances or manner of the alleged assaults or the currency of the complaints were such as to suggest a pattern casting substantial doubt on the validity of the charges made by the victim in this instance" (People v Mandel, 48 NY2d 952, 953 [1979], appeal dismissed & cert denied 446 US 949 [1980]; see People v McCray, 23 NY3d 193, 199 [2014]). County Court's determination in this regard is supported by our own in camera review of the records.[FN8]
Finally, defendant alleges that an improper comment by the prosecutor deprived him of a fair trial. Specifically, the prosecutor argued that the defense's theory regarding defendant's DNA having transferred to the victim's anus while wrestling with defendant "defies logic" because Raydo was "adamant" that "only two donors contributed to the DNA in [the victim's] anus." The prosecutor emphasized that if DNA had transferred while wrestling with defendant, there would be DNA from more than two donors given that the victim's sister was also wrestling and because the wrestling occurred in the bed where the victim's mother sleeps every night. Defendant objected on the basis that this mischaracterized Raydo's testimony, which County Court overruled. Having carefully reviewed Raydo's testimony, especially her testimony on redirect, the prosecutor's challenged remark was "fair comment on the evidence and the reasonable inferences to be drawn therefrom" (People v Williams, 163 AD3d 1160, 1165 [3d Dept 2018] [internal quotation marks and citation omitted], lv denied 32 NY3d 1179 [2019]; see People v Abussalam, 196 AD3d 1000, 1009 [3d Dept 2021], lv denied 37 NY3d 1144 [2021]). Finally, we are unpersuaded by defendant's conclusory assertion that his sentence is excessive and decline the invitation to reduce it in the interest of justice (see CPL 470.15 [6] [b]; People v Cruz, 238 AD3d 1327, 1331 [3d Dept 2025], lv denied 43 NY3d 1054 [2025]; People v Grady, 233 AD3d 1369, 1374 [3d Dept 2024], lv denied 43 NY3d 963 [2025]). Defendant's remaining contentions, to the extent not specifically addressed herein, have been examined and found to be lacking in merit.
Clark, J.P., and Lynch, J., concur.
Mackey, J. (dissenting).
We respectfully dissent. Although we agree with the majority's determination that the verdict is not against the weight of the evidence, we would reverse and remand for a new trial because, in our view, County Court committed numerous errors that deprived defendant of a fair trial.
First, County Court committed constitutional error when it curtailed defendant's cross-examination of the victim concerning her alleged prior inconsistent [*13]statements. "[P]rior inconsistent statements, which might be inadmissible hearsay if introduced on direct, are admissible for impeachment because placing the inconsistency before the jury serves the truthtesting function of cross-examination which is integral to our adversary system" (People v Hults, 76 NY2d 190, 197-198 [1990]). "The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the accuracy of the truth-determining process" (Chambers v Mississippi, 410 US 284, 295 [1973] [internal quotation marks and citations omitted]). "Confrontation [C]lause violations are subject to a constitutional harmless error analysis" (People v Robinson, 216 AD3d 1252, 1255-1256 [3d Dept 2023] [internal quotation marks and citations omitted]), and "[c]onstitutional error requires reversal unless the error's impact was harmless beyond a reasonable doubt . . . based on a review of the entire record" (People v Hardy, 4 NY3d 192, 198 [2005] [internal quotation marks and citations omitted]). "[H]owever overwhelming may be the quantum and nature of other proof, the error is not harmless if there is a reasonable possibility that the error might have contributed to the conviction" (id. [internal quotation marks, ellipses, brackets and citations omitted]; see People v Robinson, 216 AD3d at 1256; People v Sepulveda, 105 AD2d 854, 855-857 [2d Dept 1984]).
During cross-examination of the victim, defense counsel attempted on several occasions to lay a foundation for confronting her with prior inconsistent statements she had made, but County Court prevented counsel from pursuing that line of questioning on hearsay grounds. The majority concludes that County Court did not err because counsel failed to lay a proper foundation, but that determination overlooks the fact that counsel was prevented from laying the necessary foundation.
"[T]he credibility of any witness can be attacked by showing an inconsistency between his [or her] testimony at trial and what he [or she] has said on previous occasions" (People v Duncan, 46 NY2d 74, 80 [1978], cert denied 442 US 910 [1979]; accord People v Bush, 184 AD3d 1003, 1007 [3d Dept 2020], lv denied 35 NY3d 1093 [2020]). However, "it is necessary that the witness be clearly and fairly apprised of the statements which may be subject to impeachment" and, therefore, a proper foundation must be laid by first questioning the witness "as to the time, place and substance of the prior statement" (People v Duncan, 46 NY2d at 80-81; see People v Bottomley 146 AD3d 1026, 1029 [3d Dept 2017], lv denied 29 NY3d 947 [2017]). The questions counsel posed prior to the People's hearsay objection are demonstrative of counsel's attempt to lay a proper foundation by ascertaining whether the victim recalled having made this prior statement by first asking where and when the prior statements were made. The following excerpt is an example of counsel's attempt to [*14]lay the proper foundation, only to be precluded from doing so:
"Q. . . . [Y]ou g[a]ve a forensic interview . . . with a woman named Sam Ribble —
A. Yes.
Q. — discussing the incident and just your life. Correct?
A. Yes.
Q. And she asked you a series of questions.
A. Yes.
Q. Okay. And that was on March 8th of 2021. Correct?
A. I don't know the date.
Q. Was it shortly after March 4th of 2021?
A. Yes.
Q. And she said you had to be truthful.
A. Yes.
Q. And you discussed going to [your sister]'s room. And you did on direct, as well. Correct?
A. Yes."
At that juncture, the testimony was interrupted by the People's objection and a colloquy ensued, during which defense counsel explained that she wished to ask the victim "about what she told others regarding the allegations of that night." County Court sustained the objection, with the somewhat befuddling explanation that "[a] statement can come in by virtue of what she's testifying about here today. The declarant is just as much subject to hearsay standard, unless it's a nonparty, but that's not what we are. So — I'm sorry, the party opponent. So I'm going to sustain the objection. If you want to find the exception, go forward accordingly."
The foregoing example, though not specifically referenced in defendant's brief to this Court, provides context for defense counsel's approach in subsequent attempts to introduce the victim's prior inconsistent statements, which defendant does expressly challenge on appeal. Specifically, defense counsel sought to question the victim regarding a conversation that she had with a relative regarding the incident. County Court once again sustained the People's objection, stating that the victim's potential testimony in response would be "categorical hearsay," despite defense counsel's explanation that her line of questioning would have been regarding a prior inconsistent statement and was sought for impeachment purposes.
On another occasion, defense counsel asked the victim whether she had alleged during the forensic interview that defendant had "contact with [her] butt." When she replied that she did not remember, counsel inquired whether showing the victim a transcript of that interview would refresh her recollection and the victim affirmed that it would. As a result, counsel sought to utilize a transcript of that interview to do so. Nevertheless, County Court ruled that the transcript could not be used to either refresh the victim's memory or to impeach her credibility with the allegedly inconsistent statements therein because "it's not inconsistent if she doesn't have a recollection." The People conceded at oral argument that this ruling was erroneous, but argued that it was harmless. We agree that the ruling was erroneous, as the law is clear that a witness cannot avoid impeachment with a prior inconsistent statement by claiming lack of memory. To the contrary, "[i]f the witness denies, or does not recall making the statement in question, the party seeking to impeach [*15]the witness may prove the statement with extrinsic evidence" (People v Nasir, 234 AD3d 1333, 1334 [4th Dept 2025] [internal quotation marks, brackets and citations omitted], lv denied 43 NY3d 1047 [2025]; see People v Maxam, 135 AD3d 1160, 1161 [3d Dept 2016], lv denied 27 NY3d 1135 [2016]; People v Buffington, 29 AD2d 229, 231-232 [4th Dept 1968]).
We disagree, however, with the conclusion that the above errors were harmless. Given that the sole physical evidence in support of the charges against defendant did not corroborate the victim's account of events prior to trial and her testimony at trial was equivocal as to the nature of defendant's alleged conduct, her credibility was a central issue for the jury to resolve (see e.g. People v Nasir, 234 AD3d at 1334; People v Robinson, 216 AD3d at 1256; compare People v Pavao, 59 NY2d 282, 288-289 [1983]). That is especially so, given that both the People's and defendant's experts agreed that there were innocent ways for defendant's DNA to be transferred onto the victim's body and in light of the victim's equivocal testimony regarding how and where defendant allegedly touched her.[FN9] Under these circumstances, we do not believe that the above errors can be considered harmless beyond a reasonable doubt (see People v Robinson, 216 AD3d at 1256; People v Ramunni, 203 AD3d 1076, 1078-1079 [2d Dept 2022]; People v Sepulveda, 105 AD2d at 855-857; see also People v Arnold, 85 AD3d 1330, 1333 [3d Dept 2011]).
The majority's conclusion that the constitutional underpinning of defendant's impeachment argument was neither argued on appeal nor preserved below is incorrect. To the contrary, in his brief on appeal defendant expressly quotes case law that County Court's evidentiary rulings "deprived defendant of his constitutional right to present a defense." As to defense counsel's efforts at trial, the attempts to introduce the victim's alleged prior inconsistent statements were not confined to a singular instance, but took place over several, evolving discussions throughout trial. In point of fact, the record is replete with defense counsel's attempts to "confront [the victim] with her prior statements" because "the jury has to hear th[em]" (emphasis added), only for counsel's efforts to be rebuffed by the court. The majority avoids discussion of these constitutional violations by styling the issue as one concerning "hearsay rulings" (majority op at 10), as if the right to impeach witnesses with prior inconsistent statements is separate and distinct from the rights protected by the Confrontation Clause of the Sixth Amendment. But, of course, it is not; to the contrary, it is the Confrontation Clause that "secure[s]" a criminal defendant "[t]he right to cross-examination" (People v Hults, 76 NY2d at 199). "Indeed 'where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice' " (People v Bradley, 99 AD3d 934[*16], 937 [2d Dept 2012] [citations omitted], quoting Chambers v Mississippi, 410 US at 302). Finally, even if defendant had failed to preserve his challenge in this regard, we would nevertheless reverse on this issue in the interest of justice (see CPL 470.15 [3] [c]; [6] [a]; see generally People v Epakchi, 37 NY3d 39, 49 [2021, Wilson, J., dissenting]; People v Jenkins, 93 AD2d 868, 869 [2d Dept 1983]).
It is our view that County Court also erred by precluding defendant from calling three of five proffered witnesses concerning the victim's bad reputation in the community for truth and veracity. "[P]resentation of reputation evidence by a criminal defendant is a matter of right, not discretion, once a proper foundation has been laid" (People v Fernandez, 17 NY3d 70, 78 [2011] [emphasis added]), and it is error to deny a defendant's request to call such witnesses on the ground that it "could result in an endless number of reputation witnesses" (People v Hanley, 5 NY3d 108, 113 [2005]).[FN10]
Moreover, even if County Court had discretion in the matter, in our opinion it abused that discretion by allowing only defendant's mother and wife to testify as character witnesses. Obviously, defendant's mother and wife could be viewed by the jury as having a strong bias in defendant's favor, certainly more so than other witnesses without such a close relationship. Balancing this against the fact that the proffered witnesses would be "very short . . . literally ten questions," even if this were a matter of discretion, it was an abuse of discretion to preclude additional character witnesses. "Since complainant's credibility was the central issue for the jury to resolve, County Court's failure to admit evidence related to complainant's bad reputation for truth and veracity cannot be considered harmless" (People v Fernandez, 17 NY3d at 78). Contrary to the majority's holding, disclosure delays did not warrant preclusion of these witnesses, as "[a] defendant's constitutional right to present a defense must be carefully guarded, and, generally speaking, trial courts should be mindful that preclusion is to be ordered sparingly, particularly when a lesser sanction — such as a brief adjournment — will suffice" (People v Bender, 236 AD3d 1184, 1187 [3d Dept 2025], lv granted 43 NY3d 967 [2025]). Said differently, "the severest sanction of preclusion is justified only when the violation amounts to willful misconduct and was designed to obtain a tactical advantage, or where a less severe penalty would perpetuate rather than limit the prejudice to the State and the harm to the adversary process" (People v Sidbury, 42 NY3d 497, 508 [2024] [internal quotation marks and citation omitted]). The record reflects that County Court adjourned trial to afford the People time to review defendant's witness statements, thus alleviating any potential prejudice caused by any delayed disclosure. Significantly, the court made no finding of prejudice, nor do the People argue on appeal that they [*17]would have been prejudiced by the presentation of the precluded witnesses. In the complete absence of prejudice, there was simply no basis to preclude defendant from calling these witnesses.
Next, according to defendant, he is at least the fifth person whom the victim has accused of having engaged in sexually inappropriate contact with her, although he is apparently the only person to have been charged. Accordingly, defendant moved in limine for permission to question the victim about her prior allegations about others and to present proof that those allegations were false. Finding the issue to be "collateral," and having previously noted that there was "no determination or conclusion" of falsity by law enforcement, County Court denied defendant's motion. However, "[e]vidence of a complainant's prior false allegations of sexual abuse . . . may be permitted if the prior allegations suggest a pattern casting substantial doubt on the validity of the charges" (People v Diaz, 20 NY3d 569, 576 [2013] [citations and internal quotation marks omitted]). Preclusion of such evidence on the ground that it was "collateral" and "hearsay" has been found to be reversible error where it "went to a material issue of defendant's defense, namely, whether the complainant had a history of making false allegations of sexual abuse by family members" (id.). Here, the victim's alleged prior false complaints of sexual abuse against another family member and schoolmates certainly went to a material issue of defendant's defense — namely, that the victim had a history of making false allegations of sexual abuse by family members and others. Accordingly, it is our opinion that County Court erred in precluding all questioning and evidence concerning this issue.
One final point made by defendant bears discussion. Defendant claims that he was prejudiced when County Court advised the jury that the defense was responsible for a delay in the proceedings. Specifically, the jury was told that "the circumstances are such that the defense just disclosed some materials that should have been provided previously. And the People are entitled to have an appropriate amount of time to review those materials. And as a result of that, we're going to have to adjourn the trial for one day. And I apologize profusely for that delay." The next day defendant requested that the court give the jury the following curative instruction: "Members of the jury, I wish to correct any misimpression that I may have conveyed yesterday when I explained why the trial had been postponed. The Court has no opinion of the case or of the presentation of either of the parties. Any explanation I provided regarding postponement shall not be considered by you, shall be stricken from the record and shall not influence your evaluation of the case in any way, shape, or form."
County Court declined to give the requested instruction, explaining that what it had advised the jury was "factually accurate" and to the extent that its[*18]"explanation to the jury represent[ed] a scintilla of a sanction, it is one brought on by the defendant and it's significantly more deferential than could have been put before the jury." Although prejudicial comments made by the court to or in front of the jury may constitute reversible error (see generally People v Walker, 119 AD2d 521, 522-523 [1st Dept 1986]), the comments here, in and of themselves, do not rise to that level. "However, under the circumstances of this case and after considering other errors and the record in its entirety, we believe the cumulative effect is such that . . . defendant was deprived of his fundamental right to a fair trial" (People v Yopp, 67 AD2d 774, 775 [3d Dept 1979]).
Accordingly, we dissent and would reverse and remand for a new trial.
Powers, J., concurs.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: It is noted that Penal Law § 130.00 now reads "[a]nal sexual contact" as opposed to conduct (Penal Law § 130.00 [2] [b]; compare Penal Law § 130.00 [former (2) (b)], amended by L 2023, ch 777, § 2). 

Footnote 2: We note that this ruling inured to defendant's benefit, particularly given a statement made by defendant to Bianco, in an interview two months after the incident, that defendant and the mother found the vibrator outside of the victim's bedroom door and that the vibrator "had never before been out of the package or used."

Footnote 3: Defendant does not appear to dispute that there was a discovery violation relative to Skuse's expert report.

Footnote 4: We disagree with the dissent's characterization of County Court earlier addressing the People's objection as to questions about an interview with Sam Ribble as "prevent[ing]" defense counsel from laying the proper foundation for a prior inconsistent statement (dissenting op at 16). Certainly, as the People objected on hearsay grounds, the court needed to address said objection.

Footnote 5: We note that when defense counsel first attempted to admit this testimony into evidence during cross-examination of the victim, a hearsay objection by the People was sustained. When defense counsel's second attempt failed, as the People again objected, this time to improper foundation for a prior inconsistent statement, a lengthy chambers conference ensued during which County Court provided defense counsel with specific guidance as to what steps were necessary to lay a proper foundation, clearly pointing out to defense counsel what the court perceived as her foundational errors and instructed her, as it had also done earlier in the course of the trial, as to the proper foundation for prior inconsistent statements (see generally People v Duncan, 46 NY2d 74, 80-81 [1978], cert denied 442 US 910 [1979]; People v Lopez, 72 AD3d 593, 593 [1st Dept 2010], lv denied 15 NY3d 807 [2010]; People v Laurey, 24 AD3d 1107, 1109 [3d Dept 2005], lv denied 6 NY3d 815 [2006]). Despite this specific guidance, defense counsel still did not lay an adequate foundation.

Footnote 6: The dissent writes that County Court erred by not allowing defense counsel to refresh the victim's recollection by way of a transcript of the forensic interview after the victim stated that she did not remember if she had told the interviewer that defendant had contact with her butt. While we certainly do not dispute that "[i]f [a] witness denies, or does not recall making the statement in question, the party seeking to impeach the witness may prove the statement with extrinsic evidence" (People v Nasir, 234 AD3d 1333, 1334 [4th Dept 2025], lv denied 43 NY3d 1047 [2025]; see People v Maxam, 135 AD3d 1160, 1161 [3d Dept 2016], lv denied 27 NY3d 1135 [2016]), the court made clear that the request to refresh the victim's recollection was being denied because the portion of the interview defense counsel wanted to use to refresh didn't address the topic that the victim was asked about. Contrary to the dissent's position, defense counsel did not ask, and therefore was not precluded from, impeaching the witness with extrinsic testimony. Moreover, although the People later called Bianco, who was present at the forensic interview, defense counsel did not ask him about this allegedly inconsistent statement which the victim denied remembering (see e.g. People v Maxam, 135 AD3d at 1161).

Footnote 7: We also briefly address the dissent's harmless error analysis as we interpret the evidence at trial differently. First, we disagree that the "sole physical evidence in support of the charges against defendant did not corroborate the victim's account of events prior to trial" (dissenting op at 18). Although, as discussed in our weight of the evidence analysis, with which the dissent agrees, only the DNA from the victim's anal swabs were suitable for comparison to defendant's DNA sample, Raydo did testify that male DNA was also detected in the swabs from the victim's breasts, vulvar, vaginal, cervical and perianal swabs. Additionally, it cannot be said that the victim's testimony at trial was "equivocal as to the nature of defendant's alleged conduct" (dissenting op at 18 [emphasis added]). Indeed, the victim's description of the sexual abuse by defendant was consistent throughout her testimony at trial.

Footnote 8: We note that the dissent's position that these prior allegations should have been admitted into evidence, in our opinion, may raise potential Rape Shield law concerns (see CPL 60.42; see e.g. People v McCray, 102 AD3d 1000, 1006 [3d Dept 2013], affd 23 NY3d 193 [2014]).

Footnote 9: Notably, the victim testified that defendant began to touch her breasts and vagina and later "put his penis inside of [her]." When asked to clarify, she testified "[i]t felt like it was in my vagina, but I've been told that there was no DNA found there and that it was in my butt." When asked whether when she testified earlier that "defendant's penis touched [her] butt[,] . . . d[id] you actually mean your butthole?" she answered, "[n]o." When asked if she meant her "anus," she answered "[y]es" but later explained that he touched around her "butthole." As to what she had previously told investigators, the victim explained that when she said "private parts" during her interview with authorities she was referring to breasts and the vagina, which she had identified during the interview on an anatomy chart. She did not recall making any statements about her butt at that time.

Footnote 10: Where, as here, a proffered reputation witness is precluded from testifying, counsel can establish the required foundation by stating on the record that the witness is being called "to testify that [the victim] ha[s] a bad reputation in their community for truth and veracity" (People v Hanley, 5 NY3d at 113 [internal quotation marks and brackets omitted]).